IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2014 Session

**STATE OF TENNESSEE v. VERNON ELLIOTT LOCKHART**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2083     Cheryl Blackburn, Judge**

**No. M2013-01275-CCA-R3-CD** - **Filed September 8, 2015**

A Davidson County Criminal Court Jury convicted the appellant, Vernon Elliott Lockhart, of one count of conspiracy to sell 300 pounds or more of marijuana within a drug-free school zone, a Class A felony; one count of possession of 300 pounds or more of marijuana with intent to deliver within a drug-free school zone, a Class A felony; ten counts of money laundering, a Class B felony; one count of possession of ten pounds or more of marijuana with intent to deliver within a drug-free school zone, a Class C felony; and one count of facilitation of possession of ten pounds or more of marijuana with intent to deliver, a Class E felony. After a sentencing hearing, the appellant received an effective ninety-four-year sentence. On appeal, the appellant contends that the trial court erred by refusing to suppress evidence obtained from the wiretaps of various cellular telephones; that the trial court erred by denying his motions to suppress evidence based upon the unlawful attachment of GPS tracking devices on two vehicles and the unlawful GPS tracking of a co-defendant's cellular telephone; that the trial court erred by denying his motions to suppress evidence seized pursuant to an unlawful search warrant for his home; that the trial court incorrectly ruled that a detective could testify as an expert in the identification and interpretation of drug ledgers; that the trial court improperly limited his cross-examination of a State witness; that the evidence is insufficient to support the convictions; that his effective sentence is excessive; and that cumulative error warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the evidence is insufficient to support the appellant's money laundering convictions in counts 14, 16, and 31. Therefore, those convictions are reversed, and the charges are dismissed. We also conclude that the trial court mistakenly sentenced the appellant in count 36 to the charged offense of possession of ten pounds or more of marijuana with intent to deliver rather than the convicted offense of facilitation, modify the appellant's sentence for the conviction from four to two years, and remand the case to the trial court for correction of the judgment. The appellant's remaining convictions and effective ninety-four-year sentence are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, Modified in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

James O. Martin, III (on appeal), and Jim Todd and Katie Hicks Hagan (at trial), Nashville, Tennessee, for the appellant, Vernon Elliott Lockhart.

Robert E. Cooper, Jr., Attorney General & Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, III, District Attorney General; and John Zimmermann, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background - Wiretaps

In State v. King, this court succinctly described the first four wiretap applications issued in this case, stating as follows:

> On October 7, 2008, Phillip L. Taylor, state investigator for the 20th Judicial District Drug Task Force of Nashville, Davidson County, Tennessee, filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 517-7591 "used by Bruce Dady" ("the First Dady Application" and "the First Dady Number"). The First Dady Application is 59 pages long and consists of 271 numbered paragraphs containing the sworn averments of Officer Taylor. The identified "concern" of the First Dady Application was "the delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit the same" ("the Target Crimes"). The First Dady Application identified the following individuals as participants in the Target Crimes: Vernon E. Lockhart, Bruce A. Dady, [Jeffrey Kristopher King, Kasey Lynn King,] Michael R. Hutchison, Matthew E. Hutchison, Brandon C. Barnes, James H. Barnes, Tony Q. Ferrer, Donald W. Ellis, Cheyenne D. Davis, Kelvin S.

Lockhart, and Talva Antoinnette Lockhart (collectively, "the Target Subjects"). Officer Taylor averred in the First Dady Application that the targeted phone number was "subscribed to by Marcia Dady" but was "believed to be used primarily by Bruce Dady."

Also on October 7, 2008, Officer Taylor filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 714-5541 "subscribed to by Cassie T. Roark" but "believed to be used primarily by Jeffery King" ("the King Application"). The King Application is 60 pages long, consists of 275 numbered paragraphs, and is substantially similar to the First Dady Application.

Also on October 7, 2008, Officer Taylor filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 289-5116 "subscribed to by Julie Draper" but "believed to be used by Vernon Lockhart" ("the Lockhart Application"). The Lockhart Application is 61 pages long, consists of 280 numbered paragraphs, and is substantially similar to the First Dady Application and the King Application.

On October 7, 2008, the Criminal Court for Davidson County, the Hon. Mark Fishburn ("the Issuing Court"), granted the First Dady Application, the King Application, and the Lockhart Application and issued as to each Application an Order Authorizing the Interception of Wire and Electronic Communications, a ten-page document. Each Order contains the following findings:

> 4. There is probable cause to believe that [the Target Subjects] have committed, and will continue to commit, the offenses of delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit same.

-3-

[As to the First Dady Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 517-7591, a telephone service provided by Verizon Wireless, . . . subscribed to by Marcia Dady, 342 Forrest Valley Drive, Nashville, Tennessee, believed to be used by Bruce Dady, Target Subject, in connection with the commission of the above described offense [sic].

[As to the King Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 714-5541, a telephone service provided by Verizon Wireless, . . . subscribed to by Cassie T. Roark at 1636 Stokley Lane, Old Hickory, Tennessee, believed to be used by Jeffery King, Target Subject, in connection with the commission of the above described offense [sic].

[As to the Lockhart Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 289-5116, a telephone service provided by Verizon Wireless, . . . subscribed to by Julie Draper, 5225 Rustic Way, Old Hickory, Tennessee, believed to be used by Vernon Lockhart, Target Subject, in connection with the commission of the above described offense [sic].

6. There is probable cause to believe that the communications to be intercepted will concern the telephone numbers associated with the Target Subjects, and the dates, times, and places for commission of the aforementioned offense when the Target Subjects communicate with their co-conspirators, associates and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown. In addition, these communications are expected to

constitute admissible evidence of the above described offense.

> 7.  It has been established adequately that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

On October 10, 2008, Officer Taylor filed with the Issuing Court an Application for Interception of Wire and Electronic Communications for the interception of wire communications through telephone line (615) 584-6075 "used by Bruce Dady" ("the Second Dady Application") (collectively with the three applications filed on October 7, 2008, "the Initial Applications"). The Second Dady Application was in large part duplicative of the First Dady Application but provided that the telephone was "subscribed to by Terry Frazier, 1455 Dickerson Bay Drive, Gallatin, Tennessee, believed to be used by Bruce Dady."

On October 10, 2008, the Issuing Court entered an Order Authorizing the Interception of Wire and Electronic Communications on the Second Dady Application. The Order includes the following findings:

> 4.  There is probable cause to believe that [the Target Subjects] have committed, and will continue to commit the offenses of delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit same.

> 5.  There is probable cause to believe that the telephone assigned phone number (615) 584-6075, a telephone service provided by A T & T Wireless Services, . . . subscribed to by Terry Frazier, 1455 Dickerson Bay Drive, Gallatin, Tennessee, believed to be used by Bruce Dady, Target Subject, in connection with the

commission of the above described offense [sic].

6. There is probable cause to believe that the communications to be intercepted will concern the telephone numbers associated with the Target Subjects, and the dates, times and places for commission of the aforementioned offense when the Target Subjects communicate with their co-conspirators, associates and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown. In addition, these communications are expected to constitute admissible evidence of the above described offense.

7. It has been established adequately that normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

Applications for additional wiretaps and for extensions of the wiretaps previously authorized ensued over the period from October 10, 2008 through late March 2009. The Issuing Court granted all of the State's applications, resulting in the electronic surveillance of a total of twenty-three telephones. The involved phone numbers were monitored for several months for evidence related to the Target Crimes.

In 2009, the Defendants were indicted in several Middle Tennessee counties on multiple charges including drug and money-laundering offenses. In the Sumner County and Davidson County cases, the Defendants each filed a motion to suppress the evidence gleaned from the wiretaps. Defendant J. King also filed a motion to suppress the evidence gleaned from the wiretaps in the Rutherford County case. Each of the trial courts held an evidentiary hearing and subsequently issued orders denying the Defendants' motions.

437 S.W.3d 856, 860-62 (Tenn. Crim. App. 2013) (footnotes omitted).

## II. Factual Background - Trial

The record reflects that the appellant's co-defendants pled guilty. In January 2013, the appellant proceeded to trial in Davidson County on sixteen counts of the Davidson County indictment.[1]

Relevant to this appeal, Sergeant James McWright, Director of the 20th Judicial District Drug Task Force, testified that his agency began investigating Jeffrey King in 2004 or 2005 and the appellant in 2006. The 18th Judicial District Drug Task Force and the federal Drug Enforcement Administration (DEA) also were involved. In 2008, Judge Fishburn signed wiretap orders, and the agencies began wiretapping various telephones. Sergeant McWright said that as the agencies obtained probable cause to wiretap additional telephones, law enforcement applied for and received permission to wiretap those phones. They also obtained orders to "ping" various cellular telephones and install "trackers" on vehicles.

Sergeant McWright testified that on March 6, 2009, law enforcement determined that the appellant's white Pyramid Engineering truck was in Tucson, Arizona. Based on telephone pings, officers tracked the truck as it moved east across the United States. On March 7, Agent Kelly Murphy of the 18th Judicial District Drug Task Force intercepted the truck on Interstate 40 near Little Rock, Arkansas, and followed it to Nashville. The truck was a three-quarter-ton pickup and was pulling a gooseneck trailer with two pallets of metal studs piled onto it.

Sergeant McWright testified that about 3:00 a.m. on March 8, he pulled onto the exit ramp at Interstate 40 and Old Hickory Boulevard. When the Pyramid truck passed by, Sergeant McWright "fell in behind it." Two highway patrol troopers, working in conjunction with Sergeant McWright, also began following the truck and "clocked" it traveling seventy-one miles per hour in a sixty-five-mile-per-hour speed zone. When the truck exited the interstate and turned onto Briley Parkway, one of the troopers stopped it, using speeding as a pretext for the stop. The second trooper walked a K-9 dog around the vehicle. Eventually, Cheyenne Davis, who had been driving the truck, gave the troopers consent to search it. During the search, the troopers found a steel box built underneath the trailer. An officer transported the truck and trailer to the West Nashville Wrecker lot. There, officers unhooked the trailer, turned it onto its side, and found bundles of marijuana in a "trap" underneath the trailer. Sergeant McWright said they removed thirty-four bundles of marijuana weighing 550 pounds. Officers also found numerous cellular telephones inside the truck. Sergeant McWright said Davis had traveled through three school zones as Davis drove on Interstate

---

[1]The State later dismissed the remaining counts.

40.

Sergeant McWright testified that while the troopers were stopping Davis, a supervisor in the "wire room" was monitoring telephone calls, and agents in the field were following a tracker on the appellant's white Range Rover. The appellant was in the Lakewood area and stopped at 6960 Old Hickory Boulevard. Sergeant McWright said the appellant "pulled in, backed out. They observed him on the camera system, and also the tracker tracked him there." After the appellant left the property, a Lakewood police officer stopped him. Sergeant McWright, having found the bundles of marijuana in the gooseneck trailer, contacted Agent Herb Kajihara and told him to arrest the appellant.

On cross-examination, Sergeant McWright testified that as a result of this investigation, law enforcement arrested thirty-nine people and seized numerous vehicles, including the appellant's Range Rover. On March 8 or 9, 2009, officers searched the appellant's home at 5225 Rustic Way and "cleaned the house out," seizing 164 items that included "fancy stuff." Sergeant McWright stated, "If we think it was bought with drug money, we take it." Seized items then could be sold to fund the drug task force. Sometimes seized vehicles were retained so that law enforcement could use them for undercover purposes. Sergeant McWright said that the appellant's white Range Rover was "awarded" to the DEA and that Special Agent Tanya Bilyeu currently was driving it as a "government car."

Agent Kelly Murphy, Director of the 18th Judicial District Drug Task Force, testified that on March 7, 2009, he went to Little Rock, Arkansas, to intercept the white Pyramid truck and parked on the shoulder of eastbound Interstate 40. About 9:00 p.m., he saw the truck pulling a gooseneck trailer. The trailer was loaded with "some sort of metal," and Agent Murphy followed the truck to Nashville. On cross-examination, Agent Murphy testified that he never saw the appellant and that he did not participate in the stop of the truck.

Special Agent James Whitsett of the DEA in Nashville testified that he assisted with the execution of a search warrant at 6960 Old Hickory Boulevard on March 8, 2009. When officers arrived, a Ford Expedition and a large dump truck were parked in the driveway, and stacks of blue plastic pipe banded together were in the back yard. Inside the home, officers found marijuana in a kitchen cabinet and the basement. Officers also found the following in the basement: black Glad trash bags containing wrappings used to wrap marijuana, a large heat seal machine, a box containing heat seal material and a packing slip addressed to the appellant at 5225 Rustic Way, and an electric chain saw with marijuana residue on the blade. Agent Whitsett described the inside of the house as "very messy" and said that "[i]t looked like it was used for the purposes of what we found in the basement."

Agent Whitesett testified that he found several cellular telephones in the home. He also found sets of digital scales that were often used by drug traffickers to break down bulk quantities of drugs into smaller quantities for sale and the following weapons: an Armalite .308 7.62 millimeter rifle, which he described as "a common sniper rifle"; a twelve-gauge Mossberg shotgun; an ST15 nine-millimeter pistol with a "red dot scope"; a MAC-10 semiautomatic firearm, which he described as a "spray and pray weapon"; a loaded Smith and Wesson nine-millimeter handgun that had been hidden under a couch cushion; and a Ruger .22-caliber pistol. Agent Whitsett also found a large amount of ammunition; utility bills addressed to Cheyenne Davis at 6960 Old Hickory Boulevard; a February 13, 2009 SunTrust cash deposit slip for $4,000; a food saver vacuum sealer and vacuum sealer bags; and a police scanner.

On cross-examination, Agent Whitsett testified that the dump truck parked at the home belonged to Jeffrey King. On redirect examination, Agent Whitsett testified that the Expedition was registered to Betty Davis in Madison, Tennessee.

Detective Aaron Thomas of the Metropolitan Nashville Police Department (MNPD) testified that in 2009, he was working with the 20th Judicial District Drug Task Force. On March 11, 2009, Detective Thomas, Agent Kajihara, and Agent Don Hardin weighed the thirty-four bundles of marijuana removed from the gooseneck trailer and photographed them. The bundles weighed "a little over 500 pounds." Detective Thomas said that a yellow sticker was on each bundle and that a sequence number and "what appeared to . . . be a weight" had been written on each sticker.

Glenn Glenn, a special agent forensic scientist for the Tennessee Bureau of Investigation (TBI), testified as an expert in forensic chemistry that he analyzed twenty of the thirty-four bundles found in the gooseneck trailer and "plant material" found at 6960 Old Hickory Boulevard. The twenty bundles contained marijuana, and the total weight of the bundles exceeded 300 pounds. The plant material also was marijuana, and the total weight exceeded ten pounds.

Agent Edward Williams, the Assistant Director of the 18th Judicial District Drug Task Force, testified that on March 8, 2009, he executed a search warrant at 5225 Rustic Way in Old Hickory, Wilson County. The home was the residence of the appellant and Julie Draper and was approximately 5,500 square feet. Multiple video cameras were mounted outside the home, and a black pickup truck and a dump truck were parked in the driveway. Agent Williams said that the dump truck appeared to be brand new and that nothing suggested it had been used for any construction work. A three-wheeled T-Rex motorcycle, a two-wheeled motorcycle, and a fully-restored Chevrolet Impala were in the garage. In front of the driver's seat of the Impala, beneath the carpet, was an "after market compartment."

Agent Williams said that the compartment was large enough to contain a weapon or contraband, and he acknowledged that a pistol or stacks of cash could have fit inside it.

Agent Williams testified that a theater room with tiered flooring was upstairs in the home, along with an office area that contained filing cabinets. In an upstairs seating area, Agent Williams discovered that a decorative wall panel could be removed. When he removed the panel from the wall, he found an area of attic space where the insulation "appeared to be well-traveled." Agent Williams pulled back the insulation and found a shoe box that contained cash. He also found a large piece of six-inch diameter PVC pipe that was sealed on both ends. He cut open the pipe and found a vacuum-sealed bag containing bundles of cash. He also found ten cellular telephones in the home and a loaded Smith and Wesson .40-caliber pistol between two mattresses in the master bedroom. The police found four cellular telephones in the black pickup. At the time of the appellant's arrest, five cellular telephones were on his person.

Agent Williams testified that he seized a large amount of documents from the home, including what appeared to be a drug ledger; a sales invoice from Aline Heat Seal Corporation; a June 26, 2007 sales receipt for the purchase of a trailer and tires from BJ's Trailers by Pyramid Engineering for $5,500; a residential lease agreement for a residence in Oro Valley, Arizona, from September 2007 to 2008; the lease of a storage unit in Oro Valley; and a February 14, 2009 receipt from Watson's store in Nashville, made out to "Kevin Lane" at 5225 Rustic Way, phone number 615-289-5116, for the purchase, delivery, and installation of theater equipment for a cash payment of $10,109.25. Agent Williams said he never knew of a Kevin Lane at the Rustic Way address. Agent Williams also found a December 20, 2007 receipt from Hayes Pipe Supply for six-inch PVC sewer pipe sold to the appellant for $2,431.07; a title for a 1965 Chevrolet Impala, owned by Estaban Colin; a 2007 real property tax statement for 6960 Old Hickory Boulevard, addressed to VEL Properties at 5225 Rustic Way; a May 2006 insurance policy for a 1997 Chaparral boat owned by Julie Draper; a 2006 federal income tax return, showing that the appellant had a business income of $8,189; and a 2007 federal income tax return, showing that Julie Draper had a business loss of $5,151. He also found documents related to the appellant's purchase and development of real property in the Bahamas.

Agent Williams identified a warranty deed for 5225 Rustic Way, showing that Julie Draper purchased the home in December 2005 for $306,000. He also identified several 2007 receipts from Worm's Way for the purchase of equipment. He stated that Worm's Way was a supply house for hydroponic supplies, which he knew to be used for growing marijuana indoors. Agent Williams did not find an indoor growing operation at 5225 Rustic Way.

Agent Williams testified that in the appellant's Range Rover, officers found a

November 27, 2007 receipt from Discount Tire in Tucson, Arizona, issued to the appellant, phone number 615-289-5116, for work on the Range Rover; an August 20, 2008 receipt from Pep Boys in Madison, Tennessee, issued to Pyramid Engineering, phone number 615-289-5116, for work on a Sliverado pickup truck; and a travel confirmation for the appellant and Alexi Smith to fly from Atlanta to Phoenix on May 24, 2008.

James Draper, Jr., Julie Draper's father, testified that his daughter was the appellant's girlfriend for several years and that they had two children together. In the fall of 2007, the appellant and Cheyenne Davis brought a trailer loaded with scaffolding to Mr. Draper's home. The appellant said he wanted to leave the trailer there because he was starting "a job" in the area. Sometime after Julie Draper's arrest in this case, police seized the trailer. At that time, the trailer had been parked on Mr. Draper's property about two years.

On cross-examination, Mr. Draper testified that the police also seized his daughter's Cadillac Escalade. During Julie Draper's relationship with the appellant, the appellant helped her open Crossroads Market. Mr. Draper saw the appellant's construction crews working at the market, installing new ceiling tiles, cabinets, and counters. However, he never saw the appellant do any work with the appellant's excavating or dump truck companies.

Agent Don Hardin of the 18th Judicial District Drug Task Force testified that he, Agent Kajihara, and Agent Bilyeu were responsible for the daily operations of investigating "the King-Lockhart organization." The agents' duties included monitoring wiretapped cellular telephones, conducting surveillance, and conducting follow-up investigation. At first, the agents were monitoring only three telephones, one of which was 865-289-5116 registered to Julie Draper. The appellant had other telephones that were registered to third parties, registered to fictitious people, or "prepaid" with no subscriber. Agent Hardin said drug traffickers commonly used prepaid phones "to thwart interception of their communications."

Agent Hardin testified that at some point, the agents obtained a court order and installed a tracker on a 1992 Acura. On the night of February 20, 2009, the car was parked at 6960 Old Hickory Boulevard, so Agent Hardin went to the property to change the batteries in the car's tracking device. While he was there, he noticed a white Pyramid Engineering pickup truck and a gooseneck trailer loaded with metal studs. The next day, Agent Hardin returned to the home and saw that Cheyenne Davis's Ford Expedition was parked there but that the Pyramid truck and gooseneck trailer were gone. On February 24, 2009, Agent Hardin intercepted a call from the appellant to Davis in which the appellant asked if Davis was "there yet." Davis said no, that he had to stop for gasoline, that he "got a room," and that he was waiting for the appellant. The appellant told Davis, "I'll be there tonight." GPS signals revealed that Davis's cellular telephone was in Tucson, Arizona. Agent Hardin

thought Davis was about to pick up a large shipment of drugs and bring it to Tennessee.

Agent Hardin testified that on March 7, 2009, he intercepted a call from Sara Woodard to the appellant. During the call, Woodard told the appellant to "bring some of that weed over here," and the appellant told her that "my boy got some, we rolling." At that time, Agent Hardin knew the Pyramid truck was just east of Little Rock, Arkansas, and was headed toward Nashville.

Agent Hardin testified that after Woodard's call, troopers stopped the Pyramid truck, which was being driven by Davis, in Nashville. At 3:40 a.m. on March 8, about eleven minutes after the stop, the appellant began trying to find Davis. He tried calling Davis several times, but Davis did not answer. Agent Hardin said that the DEA had installed a "pole camera" down the street from 6960 Old Hickory Boulevard, which he described as a "stash house." He acknowledged that a tax statement for the home was in the name of VEL Properties, a company owned by the appellant, and said that "VEL" stood for "Vernon Elliott Lockart." Agent Hardin was in the wire room at the time of Davis's arrest, was monitoring the stash house, and saw the appellant's white Range Rover pull into the driveway. The appellant immediately backed out and headed east on Old Hickory Boulevard. At 5:08 a.m., the appellant telephoned Jeffrey King and told King that the police had stopped him in Lakewood. The appellant told King to have King's brother-in-law drive by 5225 Rustic Way to see if the police were there.

Agent Hardin testified that he later examined the black Glad trash bags found in the basement of 6960 Old Hickory Boulevard. The bags contained cellophane wrappings, and Post-It Notes "that seemed to reflect a weight" were attached to the wrappings. The weights totaled 735.7 pounds. On March 18, 2009, Agent Hardin participated in the seizure of a trailer from James Draper's home. Agent Hardin reached underneath the trailer and felt a "false bottom." He said the false bottom was a "a big void" where marijuana could be stored.

On cross-examination, Agent Hardin testified that it took less time to obtain a wiretap order in state court than federal court because "there are several fewer levels of bureaucracy to go through." He said that while he monitored the appellant's calls, "very few . . . outlined any sort of construction or hauling business." Agent Hardin said he never saw the appellant at 6960 Old Hickory Boulevard but "saw [the appellant] drive up there when we had Cheyenne Davis stopped."

Officer Vaygen Trimble testified that in March 2009, he worked for the Lakewood Police Department. In the early morning hours of March 8, 2009, an undercover detective requested assistance because the detective "had noticed a vehicle traveling at a high rate of speed, also swerving on the roadway, thought the vehicle's driver may have been

-12-

intoxicated." Officer Trimble was in the area and made contact with the vehicle, a white Range Rover. He followed the Range Rover and saw it swerve a couple of times. Officer Trimble stopped the vehicle and advised the driver, who was the appellant, that the appellant was weaving.

Officer Trimble testified that he noticed that the vehicle had darkly tinted windows. He checked the tint with an electronic meter and discovered that the tint was illegal. Officer Trimble said that he was just about to let the appellant go when Agent Kajihara asked him to detain the appellant. Officer Trimble put the appellant into the back of his patrol car and waited for Agent Kajihara to arrive. Later, Officer Trimble and the appellant were in Officer Trimble's patrol car and were parked in front of 5225 Rustic Way. Officer Trimble said that he asked the appellant why the appellant "chose this line of work" and that the appellant answered, "[M]oney."

On cross-examination, Officer Trimble testified that when he put the appellant into the back of his patrol car, the appellant was "detained" but was not under arrest. Agent Kajihara arrived fifteen or twenty minutes later.

Nathan Burton, the Director of Business Services for the Tennessee Secretary of State's Office, testified that Pyramid Engineering was incorporated on November 20, 1996, but was administratively dissolved in 2001. VEL Trucking and Excavation was incorporated on August 16, 2006, but was administratively dissolved in August 2008.

Max Tate, Jr., testified that in 2008 and 2009, he bought, sold, and leased properties. At some point, Tate leased a residential unit to the appellant. The unit was on the sixteenth floor of the Viridian Building in downtown Nashville, and the lease was for one year for $2,200 per month. One month, the appellant paid the lease with money orders. Two or three months, the appellant paid the lease with cash.

On cross-examination, Tate testified that, most of the time, the appellant paid the monthly lease with a personal check. Tate said he thought that the appellant had a dump truck business and that the appellant bought and sold residential homes.

Kenneth Benson testified that in 2009, he worked at Watson's furniture store in Nashville and sold some theater seating to "Kevin Lane." Benson said the transaction was unusual in that the buyer paid for the seating with cash and that "it was a pretty large sum." Also, when Benson spoke with the buyer on the telephone, "the gentleman I was working with on the phone conversation his name seemed to change or be different or not recognized." Benson identified the appellant in court as Kevin Lane.

Nancy Valenzuela testified that she worked for CubeSmart, formerly known as U Store It, a storage facility, in Tucson, Arizona. She identified a receipt found at 5225 Rustic Way, showing that she rented storage unit A23 to a man from Division 4 Engineering of Oro Valley, Arizona, on December 10, 2008, and that he paid $220 cash. Valenzuela said she remembered the event "somewhat" and described the man as a "bald black gentleman very well-dressed, very nicely spoken." The State asked if she would recognize the man if she saw him, and she answered, "I can't say that I could." She said that the man received a "gate code" to access the storage unit twenty-four hours per day, that the code was supposed to be a unique number, and that a lessee was not supposed to give the code to anyone. Valenzuela identified a company log showing the number of times someone used the unit's gate code to enter the facility. On February 25, 2009, someone used the code at 8:05 p.m. and left at 8:09 p.m. On February 26, 2009, someone used the code at 12:12 p.m. and left at 12:17 p.m. On March 5, 2009, someone used the code at 9:26 p.m. and left at 9:31 p.m.; 9:34 p.m. and left at 9:39 p.m.; and 9:57 p.m. and left at 10:02 p.m.

Valenzuela testified that the man "would come in with a truck and a large trailer with pipe, large pipe." The truck was a white pickup with a pyramid on the side, and Valenzuela saw it four or five times. She said the man would back the trailer into the unit, which was twelve feet by thirty feet. The truck and trailer could not fit into the unit together, but the unit door could be pulled down with only the trailer inside. Someone made a credit card payment for the unit on February 19, 2009, in the amount of $223.96.

On cross-examination, Valenzuela testified that she never saw the trailer all the way in the unit with the door closed. Instead, "the door would come down to where the front of the trailer would stick out, like the V part," and the bottom of the door would be three or four feet off the ground. She said the same person who leased the unit was driving the truck.

Richard Senn testified that he was an employee at Worm's Way, an indoor and outdoor gardening center. Senn identified 2007 receipts found at 5225 Rustic Way, showing the purchase of items from the store. He also identified photographs of hydroponic supplies and said the supplies resembled items sold in the store.

David Cole, the Operations Manager for Hayes Pipe Supply, identified invoices seized at 5225 Rustic Way for six-inch sewer pipe, six-inch water pipe, and two-inch water pipe, products sold by his company. The State showed him a photograph of the blue pipe found outside 6960 Old Hickory Boulevard, and he said Hayes Pipe sold that type of product.

Esteban Sanchez testified that he sold a red Chevrolet Impala to "two guys" for $9,500 cash. Sanchez identified the car's title seized at 5225 Rustic Way, showing him as the owner of the car. The State showed Sanchez photographs of the Impala taken at the home. He said

that after he sold the car, someone modified it with different rims, a different steering wheel, and electronics in a door panel.

Bernard Smith testified that he had known the appellant "a few years" because they "ran in the same circles" but that he did not know Julie Draper. In the "early 2000s," Smith bought a 1997 Chaparral Signature 260 Pleasure Craft boat. Sometime in 2006 or 2007, Smith sold the boat to the appellant for more than $10,000. The appellant paid cash for the boat. On cross-examination, Smith acknowledged that he and the appellant "never exchange cash." He said he did not remember telling a detective that he sold the boat in "Wheels and Deals."

John Swartz testified that he worked for Dollar Thrifty Automotive Group, a car rental company, and identified two 2009 rental agreements. According to the first agreement, the appellant rented a Dodge Charger at the Sky Harbor Airport in Phoenix, Arizona, on February 25, 2009. The appellant was supposed to return the car on February 27, 2009, but did not return it until March 6, 2009, and had driven it 1,037 miles. According to the second agreement, the appellant rented a car in Ft. Lauderdale, Florida, on February 27, 2009. The car was supposed to be returned on March 1, 2009, but was not returned until March 2 and had been driven 365 miles.

Tammy Crabtree testified that she worked for BJ's Trailers in Lebanon, Tennessee, and identified a receipt found at 5225 Rustic Way for a trailer and spare wheel sold to Pyramid Engineering and Development on June 26, 2007. The buyer paid cash. On cross-examination, Crabtree testified that the trailer was a twenty-four-foot dovetail trailer.

Jean Johnson, the Senior Vice President of Renasant Bank in Hermitage, Tennessee, identified documents for various accounts at the bank. An account for Julie Draper, doing business as Midsouth Investment Group, was open from November 2006 to April 2009 and had $4,400 in cash deposits. An account for VEL Properties was open from December 2006 to December 2009 and had $33,400 in cash deposits. An account for VEL Trucking was open from December 2006 to February 2009 and had $32,570 in cash deposits. An account for the appellant was open from February 2007 to March 2009 and had $187,431 in cash deposits. Regarding the VEL Trucking account, Johnson stated that the appellant "would write a check to a proposed employee, and then he would sign it. And then he would redeposit [it] back into his business account. . . . And that could be a way of laundering money." She said the appellant could have been cashing checks for employees who did not have bank accounts. Johnson said that her bank financed part of the purchase price for one of the appellant's dump trucks and that he told her, "[D]on't worry, I have the rest."

On cross-examination, Johnson testified that the appellant's truck loan was about

-15-

$76,000. Johnson's bank also provided financing for the Crossroads Market real estate and two investment properties.

David Kline of the Nashville Planning Department testified that he managed the department's mapping division. At the State's request, Kline produced maps showing that several public schools were within 1,000 feet of a section of Interstate 40 and within 1,000 feet of a section of Andrew Jackson Parkway. Steve Keel, the Director of School Security for the Metropolitan Nashville Public Schools, testified that the schools existed in March 2009.

Arthur Choate testified that he was a truck driver and used to work for the appellant. He also rented a house from the appellant on Cude Lane in Davidson County. Choate said that he drove a dump truck for the appellant for more than one year and that the appellant had a total of three trucks. All of the trucks were new. The appellant paid Choate and the other drivers with checks. Sometimes, if drivers worked all day and could not get to the bank, the drivers would sign their checks and give them back to the appellant. The appellant then would give the drivers cash for the checks. The appellant did that four to six times. Choate said the appellant kept a boat at the home on Cude Lane and parked a Chevrolet pickup truck with a gooseneck trailer there.

On cross-examination, Choate testified that the appellant billed clients $65 per hour for the dump trucks and that the appellant paid Choate $12 to $15 per hour. Choate said that he used to prepare invoices for the appellant's business and that the business was "clearing" an average of $900 to $1,100 per day. Over time, the amount of work declined and eventually stopped. Choate said, though, that "we worked steady . . . for a year."

Herbert Cantrell acknowledged that he was charged with conspiracy to sell more than 300 pounds of marijuana in Davidson County; possession of more than 300 pounds of marijuana in his residence in Cheatham County; and possession of more than seventy pounds of marijuana in Sumner County. Cantrell pled guilty in each county to conspiracy to sell more than seventy pounds of marijuana and received an eight-year sentence to be served as six months in jail and the remainder on probation. At that time of the appellant's trial, Cantrell had served his jail sentence.

The State asked how Cantrell became "mixed up in all this." Cantrell testified that he "got to hurting for money" and that Jeffrey King asked him to "hold" marijuana at Cantrell's house. King paid Cantrell for storing the marijuana there. Cantrell said the appellant came to Cantrell's home twice. Both times, the appellant and King went into Cantrell's garage and counted money with a money counter. Cantrell estimated that he saw King and the appellant with $10,000.

On cross-examination, Cantrell testified that at some point, police officers kicked in the door of his house. The officers took his washer and dryer and put a lien on his home. Cantrell spoke with Agents Hardin and Kajihara and gave them information about the appellant. He acknowledged that in an affidavit, he said he knew the appellant from having seen the appellant's photograph on television after King's arrest. He also acknowledged that prior to his guilty pleas, he was facing a twenty-five-year sentence in Davidson County alone. He denied telling someone that he had to come up with a story about the appellant in order to get his plea deal.

Omar Barbee acknowledged that he was indicted in this case for conspiracy to sell 300 pounds or more of marijuana but pled guilty to conspiracy to sell seventy pounds or more in exchange for an eight-year suspended sentence. Barbee testified that he met the appellant "a while ago . . . just in passing" and that they used to socialize. At some point, Barbee was in an accident that left him unable to work for a while. Barbee told the appellant that he was "down on his luck," and the appellant told Barbee that the appellant "would see what he could make happen." One day, the appellant gave Barbee a cellular telephone and had Jeremiah Robertson deliver five or ten pounds of marijuana to Barbee's home. The appellant continued to have Robertson or Cheyenne Davis deliver marijuana to Barbee, usually ten to twenty pounds at a time. Barbee said he received the marijuana on consignment, sold it, and paid the appellant for it. Barbee would give the money to Robertson, and Robertson would deliver the money to the appellant. One time, Julie Draper picked up the money from Barbee. On the afternoon of March 4, 2009, Robertson met Barbee on a country road in Robertson County and transferred thirty pounds of marijuana to Barbee. After Barbee's arrest in this case, the police searched his home and found thirty pounds of marijuana and $11,000 he owed the appellant. He estimated that he sold a total of 300 to 400 pounds of marijuana. On cross-examination, Barbee testified that most of Roberton's deliveries occurred in 2008 and that the appellant never delivered marijuana to him.

Thirty-year-old Jeremiah Robertson, the appellant's cousin, testified that he was charged with conspiracy to sell 300 pounds or more of marijuana in this case but pled guilty to conspiracy to sell seventy pounds or more and received a ten-year suspended sentence. He also pled guilty in Wilson County to possession of ten pounds or more of marijuana and received a four-year sentence to be served as ten years on probation. In 2002 or 2003, Robertson was a sophomore at Western Kentucky University. The appellant asked Robertson to rent a house for him, and Robertson agreed. Robertson rented a house on New Towne Road in Antioch so the appellant could store his drugs there. Robertson stayed at the house sometimes, and he occasionally smelled or saw marijuana. The appellant reimbursed him for the rent.

Robertson testified that in 2005 or 2006, he delivered marijuana for the appellant and

that the appellant paid him $250 for deliveries. Later, Robertson moved into a house in Antioch. Cheyenne Davis would bring shipments of marijuana to the house and store it there. Robertson said that the drugs came from Arizona and that Davis had to crawl under a gooseneck trailer to unload bundles of marijuana. Robertson acknowledged that the appellant kept pipe on the trailer to avoid suspicion and said that Davis brought five or six shipments per year.

Robertson testified that in addition to delivering marijuana for the appellant, he picked up money from sellers, including Omar Barbee. Robertson identified receipts from Worm's Way and said that he bought most of the hydroponic equipment but that the appellant bought some of it. Robertson said he was "just trying to see how hard it would be to grow" marijuana and that he kept the equipment in a shed behind Arthur Choates's residence on Cude Lane in Wilson County. He acknowledged that he stopped working for the appellant in December 2007 but that he "got back in it just shortly before everybody got arrested." On March 4, 2009, Robertson transported two black bags containing marijuana from a home on Pulley Road to the appellant's house. The appellant followed Robertson from Pulley Road to Rustic Way. Robertson estimated that he earned $50,000 to $60,000 from the appellant.

On cross-examination, Robertson acknowledged that he had a "grow operation" in Wilson County. He also acknowledged that he did not work for the appellant from December 2007 until March 2009 so that he could go back to school. He said he "didn't even pick up [the appellant's] calls" during that time. He denied making deliveries to Barbee in 2008.

Chad Durham testified that he was a barber in Madison, Tennessee, and used to go to school with the appellant and Jeffrey King. Durham was charged with conspiracy to sell 300 pounds or more of marijuana in this case but pled guilty to possession of ten pounds or more and received a two-year sentence to be served as four years on probation. In 2006, Durham wanted to buy a boat for $5,000. The seller "said he would take some pot for it," so Durham obtained ten pounds of marijuana from the appellant and gave it to the seller. Jeremiah Robertson delivered the marijuana to Durham.

Durham said that in 2008, he was still obtaining marijuana from the appellant occasionally. On March 4, 2009, Durham went to the appellant's house on Rustic Way and picked up ten pounds of the drug. At the time of Durham's arrest, he owed the appellant about $6,000. He said that he did not want to testify against the appellant but that he did not have any choice because he did not want to go to prison.

On cross-examination, Durham testified that at some point, the police kicked in his door, "went through [his] house," and took televisions and a small amount of money. The police did not arrest Durham that day but later arrested him at his place of employment.

-18-

Durham acknowledged giving a statement to the police in which he said he obtained marijuana from Robertson in 2008. He said Robertson was lying when Robertson testified that he was not involved with the appellant in 2008.

Special Agent Tanya Bilyeu of the DEA in Nashville testified that she became involved in the investigation in June 2008. As part of the investigation, Agent Bilyeu went to Renasant, Regions, and SunTrust Banks and discussed cash deposits made into certain accounts with bank officials. The cash deposits totaled more than $600,000. Agent Bilyeu stated that she focused on cash deposits because drug traffickers were paid with cash, not checks.

Agent Bilyeu testified as to the following cash deposits at Renasant: From June 5, 2007, to February 17, 2009, the account for VEL Trucking, $32,570 in cash deposits; May 12, 2006, to October 2, 2007, Julie Draper doing business as Midsouth Investment Group, $4,400; August 28, 2007, to March 3, 2009, Vernon Lockart, $187,431; and August 6, 2007, to February 12, 2009, VEL Properties, $33,400. She testified as to the following cash deposits at Regions: July 9, 2007, to February 13, 2008, Crossroads Market, $37,200; November 3, 2005, to August 31, 2007, Midsouth Investment Group, $267,598; and June 29, 2006, to February 20, 2009, VEL Properties, $78,147.01. She said that the Crossroads Market was a small convenience store in White House, Tennessee, and that it was owned by the appellant but "run" by Draper. Agent Bilyeu said that $21,400 was deposited into Cheyenne Davis's account at SunTrust from October 8, 2008, to March 9, 2009, while Davis was in Oklahoma, New Mexico, or Arizona and that the appellant most likely made the deposits into Davis's account. The only evidence of legitimate employment Agent Bilyeu ever found for Davis was a $60 check he received from a cleaning service.

Agent Bilyeu testified that she never saw evidence that Davis or Jeremiah Robertson sold drugs for the appellant. Davis's role in the organization was to drive the Pyramid Engineering truck, and Robertson's role was to "live at the stash houses, protect the marijuana as well as drive it from point [A] to point B for Mr. Lockhart." She acknowledged that the gooseneck trailer attached to the Pyramid truck matched the one on the receipt from BJ's Trailers. The contact telephone number on the receipt was 615-525-8141, and the police later found a telephone with that number at 6960 Old Hickory Boulevard. Agent Bilyeu said the appellant bought three dump trucks costing $133,000, $131,000, and $129,000. He bought two of the trucks "outright" and financed the third. At some point, Agent Bilyeu became aware that the appellant was buying theater chairs from Watson's. On February 13, 2009, agents intercepted a call from a phone registered to Julie Draper with the number 289-5116 in which the appellant spoke with the salesman at Watson's. During the call, the salesman referred to the appellant as "Kevin." In a second call from the appellant to Watson's, the appellant identified himself as "Vernon" and wanted to know the location

of the chairs.  In a third call, the appellant spoke with Draper and asked if the chairs had been delivered to their home.  Agent Bilyeu said the police later seized the chairs because the appellant paid cash for them.  The police also seized $154,000 in cash from inside a wall at 5225 Rustic Way and various receipts showing that the appellant paid cash for "travel, clothes, miscellaneous expenses and that sort of thing."

Agent Bilyeu testified that on February 20, 2009, the appellant flew from Nashville to Tampa, Florida.  On February 25, the appellant flew from Tampa to Phoenix and rented a car.  Subsequently, the appellant returned to Nashville.  On the afternoon of March 4, 2009, Robertson transferred marijuana from a location on Pulley Road in Davidson County to the appellant's home on Rustic Way.  The appellant was going to sell the marijuana to Andre White, Omar Barbee, and Chad Durham.  En route to the appellant's house, Robertson traveled on Interstate 40, Old Hickory Boulevard, and Andrew Jackson Parkway, passing within the drug-free zones of two schools.  Meanwhile, agents were intercepting telephone calls and observing the transfer.  Agent Bilyeu explained that the transfer "was very important to us.  This was the first time we had intercepted Mr. Lockhart actually giving directions and coordinating the marijuana transaction.  Not only did we hear it on the phones, but we actually were able to observe it happen in Tennessee."  About 4:30 p.m. on March 4, the appellant flew from Nashville to Phoenix.  Agent Bilyeu said that Cheyenne Davis had left Nashville on February 21 and that the appellant returned to Phoenix on March 4 because he needed to extend a rental car agreement but could not do so over the telephone.  The appellant flew back to Nashville on March 6.

On cross-examination, Agent Bilyeu testified that other than the marijuana transfer from Pulley Road on March 4, 2009, agents did not hear the appellant orchestrate any other drug transactions.  However, she explained that "you have to remember we were not up on all of his telephones.  He used prepaid phones and he only kept them for a short period of time, so trying to find his new [phone] numbers and then get the court orders and get up on them before he dropped them was very difficult."  Agent Bilyeu was one of the surveillance officers for the March 4 marijuana transfer.  She said that she saw the appellant's Range Rover on Pulley Road before the transfer but acknowledged that she never saw the appellant. She also acknowledged that in addition to cash deposits, the bank accounts she discussed on direct examination received check deposits.  For example, VEL Trucking received $70,865 in check deposits from February 28, 2007, to May 31, 2007, including checks from other trucking companies.  Regarding whether the appellant was running a legitimate trucking company, Agent Bilyeu stated, "Seventy-thousand dollars when your overhead right off the top is $300,000 in losses for dump trucks -- that's not legitimate, that is bankruptcy."  The Midsouth account at Regions Bank received about $55,000 in check deposits from November 5, 2005, to March 31, 2006.  Agent Bilyeu acknowledged that she did not know where the cash used to purchase the boat, Chevrolet Impala, Worm's Way equipment, or other items

that were the subject of the money laundering counts came from.

Julie Draper testified that she was charged with money laundering in this case and in Wilson County, pled guilty to four counts of facilitation to commit money laundering, and received an eight-year sentence to be served on probation. Draper met the appellant in 2003, and they had two children together. However, at the time of the appellant's arrest, Draper was "kind of" living with her mother.

Draper testified that her home with the appellant at 5225 Rustic Way was in her name alone. In purchasing the home, Draper signed a loan application, falsely claiming that she earned $8,500 per month from Midsouth Investments. She said she signed the application because the appellant asked her to do so. Draper received cash numerous times from the appellant and deposited the cash into the bank account for Crossroads Market. Draper then wrote checks from the account to VEL Properties. Other than the Crossroads Market, Draper was never employed while she was in a relationship with the appellant. The store was open about two years but "never really turned a profit." Draper said that she never ordered a heat seal machine and that she did not know $154,000 was behind a wall in her home. She said she and the appellant paid cash for items "[s]ometimes." When she needed money, she told the appellant, and he gave it to her.

On cross-examination, Draper testified that two or three days after the appellant's arrest, she returned to their home on Rustic Way and found "[e]verything gone basically." Mattresses, her children's furniture, and clothes were still there. The police arrested Draper about six months later, and she spent seven months in jail. At that time, her children were four years old and eighteen months old. Draper eventually gave a statement to the police in order to get out of jail. She testified that she saw the appellant use his dump trucks and that she visited him at his job sites. Draper did not know where the appellant obtained the money he gave her, but he gambled "quite a bit." She said she never saw the appellant with a gun and that the gun found under their mattress belonged to her.

Special Agent Kristofer Haws of the DEA in Tucson, Arizona, testified that he participated in the investigation of the appellant. On October 13, 2008, Agent Haws saw a white Pyramid truck, without a trailer, backed into the driveway of a home on West Sage Brook Court in Oro Valley, a suburb of Tucson. Two days later, agents were watching the house when Agent Haws saw a Volkswagen Jetta leave the residence. Agent Haws followed the Jetta to a grocery store and saw the appellant get out of the car. The appellant went into the store, and Agent Haws followed him inside. The appellant bought apple juice, left the store, and headed north in the Jetta. Agent Haws said that he was following the appellant and that the appellant began doing "counter surveillance maneuvers" to see if he was being followed. Nashville agents, who were monitoring the appellant's calls, heard the appellant

tell someone to "flush it" and notified Agent Haws. Agent Haws said that at that point, agents left the area because "we knew we had been been seen."

Agent Haws testified that in February 2009, Agent Bilyeu contacted him and requested his assistance "to go out and check on a possible suspect." On February 25, Agent Haws drove to the Oracle Road area and found the white Pyramid truck in a Hampton Inn parking lot. A trailer with "aluminum like stud beams" was attached to the truck. Agent Haws set up surveillance and followed the truck to a storage facility. At that point, he "broke off surveillance."

Agent Haws testified that he later received information that the appellant had rented a car and was in town with Cheyenne Davis. On March 2, 2009, Agent Haws found a white Dodge Charger in the Hampton Inn parking lot. The next day, pings from Davis's cellular telephone led Agent Haws to a shopping mall a few miles from the hotel. He saw Davis outside the mall and talking with an unknown white male.

On cross-examination, Agent Haws testified that after the Pyramid truck entered the storage facility on February 25, he could not see where the truck went. From February 25 to March 3, 2009, Agent Haws never saw the appellant.

Special Agent Derek Brown testified that he used to be assigned to the DEA in Tucson, Arizona, and that he participated in the investigation of the appellant. As part of his investigation, Agent Brown looked for an account in the appellant's name at Tucson Electric Power (TEP) and found an account for a home on West Sage Brook Court. On October 15, 2008, agents conducted surveillance of the home, and Agent Brown saw a white Pyramid truck and a Volkswagen Jetta in the driveway. Agents Haws and Brown followed the Jetta to a grocery store and saw the appellant driving the car. On March 18, 2009, Agent Brown participated in the execution of a search warrant for a storage unit. Inside, agents found a blue Shop-Vac, a blue tarp, hand cleaner, an empty box for a seven-inch polisher and sander, and a white plastic bag containing blue gloves.

Detective Herbert Kajihara of the MNPD testified that at the time of this investigation, he was an agent for the 20th Judicial District Drug Task Force. He began investigating Jeffrey King in 2006, and the investigation evolved to include the appellant. During surveillance on March 4, 2009, Detective Kajihara saw Jeremiah Robertson come out of a home on Pulley Road. The appellant's Range Rover was at the home, and Detective Kajihara followed it and Robertson's car to the appellant's home on Rustic Way. En route, the vehicles traveled from Interstate 40 onto Old Hickory Boulevard and Andrew Jackson Parkway. Later that day, the appellant left his home to fly out of Nashville. After the appellant left, Andre White arrived.

-22-

Detective Kajihara testified that on March 8, 2009, Agent Bilyeu told him that the appellant was at the "stash house" on Old Hickory Boulevard. Detective Kajihara was instructed to find the appellant and follow him. Detective Kajihara drove to Old Hickory Boulevard, saw the appellant's Range Rover, and began following it toward Lakewood. From the appellant's telephone conversations, officers knew he was trying to locate Cheyenne Davis. Detective Kajihara said that troopers had already stopped Davis but that he did not want to stop the appellant without knowing whether the gooseneck trailer contained marijuana. The appellant's vehicle was swerving back and forth and speeding, so Detective Kajihara "called for someone to stop him on a suspicion of DUI." Lakewood Police Officer Vaygen Trimble stopped the appellant.

Detective Kajihara testified that Andre White, who was a marijuana distributor for the appellant, was sitting in the passenger seat of the Range Rover. Officer Trimble put the appellant into the back of his patrol car, leaving White in the Range Rover. At 4:54 a.m., the appellant telephoned White from the patrol car and told him to "put that li'l slim phone I got in the glove box" and that "[t]hese [motherf****ers] at my house." The appellant also telephoned King and told him to have someone check the appellant's house. During the appellant's stop, Detective Kajihara was notified that marijuana was in the gooseneck trailer. At that point, he arrested the appellant.

Detective Kajihara testified that Officer Trimble transported the appellant to 5225 Rustic Way. Julie Draper was living with her parents at the time, and she and her children were not at the home. Detective Kajihara advised the appellant of his rights and that he was being charged with conspiracy to sell marijuana. Detective Kajihara found the appellant's "slim phone" in the glove box of the Range Rover, and officers found a similar phone on Davis's person. Detective Kajihara found a wiretapped phone on the appellant's person and later found a wiretapped phone at 6960 Old Hickory Boulevard.

Detective Kajihara testified that he assisted with the inventory of the thirty-four bundles of marijuana recovered from the gooseneck trailer and that each bundle had been labeled with a number and a weight. Detectives Kajihara and Thomas weighed the thirty-four bundles, and their total weight was 551 pounds. The nine garbage bags found at 6960 Old Hickory Boulevard contained wrappings that had been similarly labeled. The total weight on the labeled wrappings was 735 pounds.

Detective Kajihara testified that thirty-nine people were charged in this case and that thirty search warrants were executed, including one at the appellant's home on Rustic Way. Documents were seized at the residence, and Detective Kajihara reviewed them. He said some of the documents were drug ledgers, which drug dealers used in order to keep track of how much drugs they "front[ed]" to distributors prior to receiving payment. The trial court

allowed him to testify, over the appellant's objection, as an expert in the interpretation of drug ledgers. He said the ledgers seized from the appellant's home showed the amounts of marijuana sold to distributors, the price the distributors paid, and the total amounts due less payments received. Some of the ledgers referred to "dro," which was a hydroponic or high-grade marijuana. Detective Kajihara said he found two kinds of ledgers: load ledgers, which recorded the amount of marijuana received from the supplier or cartel, and ledgers for distributors, who received marijuana from the appellant. Detective Kajihara calculated the total "load amounts" as 5,702.09 pounds, which did not include the 551 pounds recovered from the gooseneck trailer on March 8 or the 735 pounds attributed to the wrappings at 6960 Old Hickory Boulevard. Therefore, the ultimate total of marijuana the appellant received was 6,988.09 pounds.

On cross-examination, Detective Kajihara testified that he never actually saw the appellant at the home on Pulley Road on March 4. He said that he thought the handwriting on the ledgers was the appellant's handwriting but acknowledged that he did not compare the handwriting to anyone else's handwriting. Officers found hydroponic equipment in this case but never found any hydroponic marijuana. At the conclusion of Agent Kajiahara's testimony, the State rested its case.

Agent Bilyeu testified for the appellant and acknowledged that VEL Trucking had $256,276 worth of check deposits from June 2007 to June 2008. Combined with the $70,865 in check deposits the company received from February 28, 2007, to May 31, 2007, VEL Trucking received $320,000 in check deposits. Agent Bilyeu noted, however, that some of the checks were paid to the appellant's drivers and that the appellant then "put them right back into his account."

On cross-examination, Agent Bilyeu testified that some of the deposited checks came from legitimate trucking companies but that some of them came from co-conspirators. Agent Bilyeu acknowledged that an accountant was responsible for bookkeeping and writing payroll checks for the appellant's trucking company and that the accountant did not testify at trial.

At the conclusion of the proof, the jury convicted the appellant of fourteen counts as follows: count 1, conspiracy to sell 300 pounds or more of marijuana within a drug-free school zone from March 2005 to 2009; count 10, money laundering related to the purchase of marijuana growing equipment from Worm's Way on April 4, 2007; count 13, money laundering related to the purchase of marijuana growing equipment from Worm's Way on May 15, 2007; count 14, money laundering related to the purchase of a 1997 Chapparal boat from Bernard Smith in June 2007; count 15, money laundering related to the purchase of a gooseneck trailer and tires from BJ's Trailers on June 26, 2007; count 16, money laundering

related to the purchase of a 1965 Impala in August 2007; count 19, money laundering related to the purchase of a commercial heat sealer on October 17, 2008; count 20, money laundering related to a lease payment for a storage unit in Tucson, Arizona, on December 10, 2008; count 31, money laundering related to the purchase of furniture from Watson's on February 14, 2009; count 32, money laundering related to a lease payment for a storage unit in Tucson, Arizona, on February 19, 2009; count 33, possession of ten pounds or more of marijuana with intent to deliver within a drug-free school zone for the transportation of marijuana on March 4, 2009; count 34, money laundering related to the payment for a rental car in Tucson, Arizona, on March 6, 2009; count 35, possession of 300 pounds or more of marijuana with intent to deliver within a drug-free school zone for the marijuana found in the gooseneck trailer on March 8, 2009; and count 36, facilitation of possession of ten pounds or more of marijuana with intent to deliver for the marijuana found at 6960 Old Hickory Boulevard on March 8, 2009.

The jury acquitted the appellant of count 2, conspiracy to commit money laundering related to the purchase of real property in the Bahamas, and count 37, possession of a firearm with intent to go armed during the commission of a dangerous felony.

### III.  Analysis

A.  Wiretaps

The appellant contends that the trial court entered five of the twenty-three wiretap orders in violation of federal and state law as well as the United States and Tennessee Constitutions and, therefore, that the trial court should have suppressed any evidence obtained as a result of the wiretap orders.  The State argues that the trial court properly denied the appellant's motion to suppress.  We agree with the State.

The record reflects that Judge Fishburn ultimately issued twenty-three wiretap orders and twenty-four extensions in this case.  The first three orders, i.e., "the First Dady Application," "the King Application," and" the Lockhart application," were issued on October 7, 2008, and the fourth order, i.e., "the Second Dady Application," was issued on October 10, 2008.  All subsequent wiretap applications incorporated by reference the previous applications, wiretap orders, and ten-day reports.  Before trial, the appellant filed a motion to suppress any evidence obtained from the wiretap orders and extensions, and the trial court denied the motion.[2]  The appellant contends that the trial court erred by denying

---

[2]Officer Phillip Taylor, the affiant for all of the wiretap applications, testified at the hearing. Although the trial court summarized his testimony in its order denying the motion to suppress, the court did not address his testimony in its analysis.  Therefore, we will not recount his testimony.

his motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

This court has stated,

> In the context of these cases, in which we are reviewing the trial courts' review of the Issuing Court's orders permitting the wiretaps, we must decide whether the trial courts erred in concluding that the Issuing Court had a "substantial basis" for finding probable cause. See State v. Moore, 309 S.W.3d 512, 523 (Tenn. Crim. App. 2009), perm. app. denied (Tenn. Feb. 22, 2010); see also Massachusetts v. Upton, 466 U.S. 727, 732-33 (1984) (holding that a reviewing court is not to conduct "a de novo probable-cause determination" but instead merely is to decide "whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause"). "A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999). Moreover, "'in passing on the validity of a warrant, the reviewing court may consider only the information brought to the magistrate's attention.'" Moore, 309 S.W.3d at 523 (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)). "'In reviewing the validity of an electronic surveillance order, we will accord "great deference" to the determination of the issuing judge.'" Id. (quoting United States v. Corrado, 227 F.3d 528, 539 (6th Cir. 2000)). "'[T]he fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant.'"

> Corrado, 227 F.3d at 539 (quoting United States v. Alfano, 838
> F.2d 158, 162 (6th Cir. 1988)).

King, 437 S.W.3d at 864-65.

Tennessee Code Annotated section 40-6-304, part of the Wiretapping and Electronic Surveillance Act, provides as follows regarding an order for electronic surveillance:

> (c) Upon an application the judge may enter an ex parte order, as requested or as modified, authorizing interception of wire, oral or electronic communications within the district in which the judge is sitting, and outside that district but within the state of Tennessee in the case of a mobile interception device, if the judge determines on the basis of the facts submitted by the applicant that:
>
> > (1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 40-6-305;
> >
> > (2) There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;
> >
> > (3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and
> >
> > (4) There is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the person.

Tennessee Code Annotated section 40-6-305 provides that a district attorney general may apply for an order authorizing the interception of wire, oral, or electronic communications

by investigative or law enforcement officers when the interception may provide evidence of (1) criminal homicide, (2) criminal conspiracy to commit criminal homicide, (3) certain drug offenses, or (4) the commission of, or conspiracy to commit, a criminal gang offense by a criminal gang member. At the time of the crimes, "a district attorney general may not apply for nor may a judge authorize the interception of wire, oral or electronic communications pursuant to § 40-6-305(3), unless the amount of the controlled substance involved is seven hundred pounds (700 lbs.) (316,960 grams) or more of any substance containing marijuana." Tenn. Code Ann. § 39-17-417(j)(13)(b) (2008).

1. (615) 289-5116

First, the appellant addresses the wiretap application for (615) 289-5116, his cellular telephone and the subject of the Lockhart Application, and contends that the application failed to establish probable cause that he was committing, had committed, or was about to commit conspiracy to possess 700 pounds or more of marijuana and failed to establish probable cause that communications related to the offense would be obtained through the interception. See Tenn. Code Ann. § 40-6-304(c)(1), (2). He also contends that the application failed to satisfy the two-prong Jacumin test for finding probable cause based upon information from a confidential informant.

As noted by this court in King, the Lockhart Application consisted of sixty-one pages and 280 numbered paragraphs. In Officer Taylor's affidavit, he detailed the King-Lockhart investigation, which ultimately began with the 2001 Texas traffic stop of James Harvey Barnes, who worked for the John Butler drug organization. The affidavit also detailed how law enforcement became aware of each conspirator in the King-Lockhart drug operation, including the appellant. Of particular significance to the appellant's claim, Officer Taylor stated in the affidavit that a confidential informant, referred to as "CS-6," learned that Bruce Dady obtained large quantities of marijuana from Jeffrey King, Kasey King, and the appellant. On August 31, 2008, Immigration and Customs Enforcement (ICE) agents stopped the appellant as he entered the United States at an Arizona/Mexico checkpoint. Although the appellant claimed he was a student at the University of Arizona in Tempe and traveled to Mexico for an "open house," investigators had no information that the appellant was associated with any university in Arizona. Moreover, records from Southwest Airlines revealed that the appellant flew from Nashville to Phoenix on August 30, 2008, and that he flew back to Nashville on or before September 1, 2008. Records from TEP showed that the appellant established electric power service at a home on West Sage Brook Court in Tucson on September 14, 2007, and that he reported (615) 289-5116 as his work telephone number. The appellant discontinued service at the home on April 29, 2008, but reactivated service on May 9, 2008. More than once, someone from TEP contacted the appellant about an overdue bill at the property, and the appellant paid the bill over the phone and with a credit card. The

electrical use at the home was low from January through May 2008, high in June and July 2008, and low again in August and September 2008. DEA Special Agent Brown saw the appellant at the home on September 30, 2008.

Officer Taylor also stated in the affidavit that on February 26, 2003, a police officer stopped a rental car being driven by Cheyenne Davis, and a search of the vehicle revealed $29,880 in cash. The officer found a listing for "Vernon cell" in Davis's cellular telephone. On January 12, 2005, a DEA agent stopped the appellant and Davis at the Nashville airport. The appellant and Davis had reserved the flights that morning, and the appellant paid for both tickets at the airport. More than $5,000 cash was on the appellant's person, and more than $6,000 was on Davis. The two men claimed they were going to Houston to purchase a truck, and the appellant gave the agent the name and telephone number for the alleged seller. However, when the agent contacted the seller, the seller stated that he had never heard of the appellant and was selling the truck to a Chris Williams. Furthermore, "pen register data" showed that from July 17, 2008, to September 25, 2008, the target phone was used in 480 calls to/from 294-1455, subscribed to and used by Cheyenne Davis; 401 calls to/from 714-5541, subscribed to Cassie Roark and used by Jeffrey King; and 38 calls to/from 517-7591, subscribed to Marcia Dady and used by Bruce Dady. Thus, the targeted phone was used to make many calls to/from persons identified as participants with the appellant in the drug operation.

In its order denying the appellant's motion to suppress, the trial court concluded that the following information in the first four applications, "which all contain essentially the same factual grounds," clearly established the necessary probable cause for issuance of the initial wiretap orders:

> (1) Six reliable confidential informants who provided key information linking Jeffrey King, his brother Kasey King, Vernon Lockhart, and Bruce Dady as part of an ongoing large-scale marijuana conspiracy . . . . Information provided by each informant is followed by a paragraph addressing the reliability and veracity of the informant.
>
> (2) The August 23, 2006 seizure of 1,800 pounds of marijuana intended for delivery to John Butler, who was determined to be a supplier for Jeffrey King.
>
> (3) The August 31, 2008 U.S. Customs stop of Vernon Lockhart where Vernon Lockhart was stopped at an Arizona checkpoint near the Mexican border where Vernon Lockhart falsely claimed

-29-

that he was a student at the University of Arizona and later investigation revealed he took a circuitous route into Mexico.

(4) Lockhart's temporary housing near the Mexican border in the name of an officially dissolved company believed to be a stash house.

(5) The 2003 and 2005 seizures of large quantities of [currency] from Cheyenne Davis when stopped by law enforcement ($29,880 in Arizona on February 26, 2003 and over $11,000 when stopped by DEA Agents at Nashville airport in 2005).

Based upon the information contained in the Lockhart Application, we conclude that there was a substantial basis for the issuing court to find probable cause that the appellant was involved in a conspiracy to possess 700 pounds or more of marijuana and that communications about the offense would be obtained by the interception of his cellular telephone conversations.

The appellant also claims that the Lockhart Application failed to establish a basis of knowledge and reliability for the various confidential sources discussed in the application as required by Jacumin. In that case, our supreme court espoused the two-pronged Aguilar-Spinelli test "as the standard by which probable cause will be measured to see if the issuance of a search warrant is proper under Article I, Section 7 of the Tennessee Constitution." Jacumin, 778 S.W.2d at 436; see Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964). Specifically, "hearsay information supplied by a confidential informant can not support a finding of probable cause unless it also contains factual information concerning the informant's basis of knowledge and credibility." State v. Henning, 975 S.W.2d 290, 294-95 (citing Jacumin, 778 S.W.2d at 432, 436). This court has explained that "under the . . . 'basis of knowledge' prong, facts must be revealed which permit the magistrate to determine whether the informant had a basis for his information or claim regarding criminal conduct." State v. Lowe, 949 S.W.2d 300, 304 (Tenn. Crim. App. 1996); see also State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). The reliability, veracity, or credibility prong deals with the truthfulness of the informant in which "facts must be revealed which permit the magistrate to determine either the inherent credibility of the informant or the reliability of his information on the particular occasion." Moon, 841 S.W.2d at 338. Courts have stressed that conclusory statements absent supportive detail will not suffice to establish these requirements. See id. at 339. However, "independent police corroboration of the information provided by the informant may make up deficiencies in either prong." State v. Powell, 53 S.W.3d 258, 263 (Tenn. Crim. App. 2000). "The requisite volume or detail of information needed to establish the informant's

credibility is not particularly great." Lowe, 949 S.W.2d at 305. Nevertheless, "the affiant must provide some concrete reason why the magistrate should believe the informant." Id.

Although the Lokchart Application described information from six confidential informants, our analysis will focus on "CS-6," who provided the most significant information about the appellant. According to the application, CS-6 stated that Bruce Dady had obtained large quantities of marijuana from the Kings and the appellant, that the Kings and the appellant were involved in the sale and distribution of hundreds of pounds of marijuana, and that they received regular shipments of marijuana. CS-6 also stated that the appellant owned VEL Trucking and VEL Properties.

Regarding the basis of knowledge prong, the Lockhart Application provided that CS-6 learned information about the appellant's involvement in the operation through CS-6's personal acquaintance with Dady and Matthew Hutchison, who were co-conspirators in this case, that CS-6 had known the "Target Subjects" for several years, that CS-6 knew about their sale and distribution of marijuana through that relationship, and that CS-6 claimed to have purchased marijuana from Hutchison, who then gave the money to Dady. Officer Taylor stated in the application that he had listened to recorded calls between CS-6 and Hutchison and that CS-6 and Hutchison discussed the purchase of marijuana. Thus, CS-6 had personal knowledge about the drug operation.

Regarding the credibility prong, Officer Taylor stated that during CS-6's recorded conversation with Hutchison, Hutchison said he had to find out the price and availability of the drug from someone else, corroborating CS-6's information that Hutchison worked for Dady. Officer Taylor also stated that CS-6 gave statements against his penal interest by admitting to his participation in buying and selling marijuana; that CS-6 was hoping to be paid for his information but would not be paid if the information was false or misleading; that CS-6 had identified Dady, the Kings, and the appellant in photographs; that an investigator had discovered that VEL Trucking and VEL Properties were incorporated by the appellant, further corroborating CS-6's information; and that CS-6's information was consistent with information received from other confidential informants. Therefore, we conclude that the application also established the informant's reliability.

2. (303) 396-4855

Next, the appellant contends that the wiretap application for (303) 396-4855, the cellular telephone for Omar Ellis, was unlawful because it relied on mostly stale information provided by a confidential informant and because the affiant, Officer Taylor, did not satisfy either prong of the Jacumin test for information that was not stale. The appellant also contends that Officer Taylor did not satisfy the Jacumin test for information in the

-31-

application that was provided by a second confidential informant. However, in our view, the application established probable cause for the wiretap order, independent of the information provided by either informant.

Officer Taylor filed the wiretap application for (303) 396-4855 on February 11, 2009. It consisted of eighteen pages and fifty-four numbered paragraphs. At that time, investigators were monitoring numerous telephones, including the appellant's phone, (615) 289-5116, pursuant to the wiretap order discussed above and a "bat-phone"[3] being used by the appellant, (615) 424-3318, pursuant to a wiretap order issued on January 30, 2009. According to the wiretap application at issue, on February 8, 2009, investigators intercepted a call from an unknown male to the appellant at (615) 424-3318. The application included a transcript of the telephone conversation and Officer Taylor's interpretation of that conversation. During the call, the appellant told the unknown male that "Pimp said he . . . left a number for me" and that "he said that he left the hitter with you." Officer Taylor interpreted "hitter" to mean that someone had left a bat-phone with the unknown male for the appellant. The unknown male started to refer to the bat-phone, but stopped himself, saying, "What this...What this pho...the gun?" The appellant asked for the number for the bat-phone, and the unknown male told him "(303) 396-4855." The unknown male later told the appellant, "This is the phone number...to him." Based on the conversation, Officer Taylor believed that (303) 396-4855 was being used by a co-conspirator in the drug operation. He noted that as of February 11, 2009, neither of the appellant's wiretapped phones had called (303) 396-4855, which "confirms to me that [the appellant] is using a bat-phone that investigators have not identified to communicate with . . . a co-conspirator (believed to be OMAR ELLIS) about drug dealing."

In its order denying the appellant's motion to suppress, the trial court did not specifically address the wiretap application for Omar Ellis's phone.[4] Nevertheless, we conclude that the information in the application provided a substantial basis for the issuing court to issue the wiretap order for (303) 396-4855. The call on February 8 was intercepted pursuant to a wiretap order issued for a bat-phone used by the appellant, the target of an

---

[3]In a previous wiretap application, Officer Taylor stated that members of the conspiracy used cellular telephones referred to as "bat-phones" for the limited purpose of communicating with each other about the drug operation.

[4]As stated previously, the appellant filed a motion to suppress all of the wiretap orders and extensions. However, the trial court's order denying the motion only specifically addressed the first four wiretap applications. The court noted that although the appellant's suppression motion was challenging all twenty-three wiretap orders as well as the twenty-four extensions for those orders, "both Defendant Lockhart and Jeffrey King's briefing primarily focus on the [four] initial wiretap applications and authorizations" involving the phones of the appellant, Dady, and King. "

investigation involving the sale of 700 pounds or more of marijuana. During the call, the unknown male tried to conceal that he and the appellant were talking about another cellular telephone left for the appellant by "Pimp" and was obviously speaking cryptically so as not to reveal Pimp's name. The unknown male told the appellant that Pimp's number was (303) 396-4855. Officer Taylor, an investigator experienced in drug trafficking and the appellant's use of bat-phones in this case, stated in the application that the appellant and Pimp clearly did not want to use telephones that were already wiretapped, that "[t]his is the purpose of the bat-phones," and that "I believe the Target Telephone is a bat-phone being used by 'Pimp,' one of the conspirators." Based on the information contained in the application, we conclude that the trial court properly denied the appellant's motion to suppress.

3. (615) 423-5979

The appellant contends that as a result of the improper wiretap order being issued for (303) 396-4855, investigators improperly obtained information that resulted in a wiretap order being issued for (615) 423-5979, another cellular telephone number being used by the appellant. He claims, therefore, that any evidence obtained from the wiretap order for (615) 423-5979 must be suppressed. However, having concluded that the application provided a substantial basis for the lower court to issue the wiretap order for (303) 396-4855, we find no merit to this claim.

4. (615) 818-2839

The appellant contends that evidence obtained from the wiretap order for (615) 818-2839, a cellular telephone for Jeffrey King, must be suppressed because the wiretap application failed to demonstrate that the phone was being used in connection with the offense or that the phone was leased to or commonly used by King. See Tenn. Code Ann. § 40-6-304(c)(4). We disagree with the appellant.

As stated previously, one of the first three wiretap orders issued in this case was for (615) 714-5541, Jeffrey King's cellular telephone. On January 9, 2009, Officer Taylor filed a nineteen-page application for an order to wiretap (615) 818-2839. According to the application, at 8:32 p.m. on December 4, 2008, investigators intercepted a call from (615) 714-5541 to 881-0721, the telephone for Corey Roark, in which King told Roark to call him back. However, King did not receive a call from Roark on any wiretapped phone, so investigators obtained the call detail records for 881-0721. The records showed the incoming call from King at 8:32 p.m. and a call three minutes later to 818-2839. Records obtained for 818-2839 showed that from December 1, 2008, through December 22, 2008, 157 calls were made from 818-2839 to just six telephone numbers. As a result, investigators believed King was using 818-2839 as a bat-phone.

The appellant contends that because the police assumed 818-2839 was being used by King but did not confirm their suspicions, "the wiretap application failed to demonstrate the phone was being used to commit the specified drug offense." We disagree. We note that the application did not have to show that King definitively was using the target phone but that probable cause existed to believe he was using it. Given that King told Roark to call him back, that Roark made a call three minutes later to 818-2839, and that nothing showed King received a call on his wiretapped phone from Roark's phone, we conclude that the application established probable cause to believe King was using the target phone. Moreover, based upon the particularly secretive nature of this drug operation and the conspirators' established use of bat-phones to communicate about the operation, the application demonstrated probable cause to believe that King was using the target phone to commit the drug conspiracy.

5.  (615) 424-3318

Finally, the appellant challenges the wiretap order for (615) 424-3318, another cellular telephone used by the appellant. He contends that the application for the wiretap did not establish the subscriber for the phone or that the phone was commonly used by the appellant. See Tenn. Code Ann. § 40-6-304(c)(4). He also claims that the application failed to establish probable cause to believe that the particular communications concerning the drug conspiracy would be obtained through the interception. See Tenn. Code Ann. § 40-6-304(c)(2).

In the January 29, 2009 application, Officer Taylor stated that on January 28, 2009, Jeffrey King made a call from 818-2839, King's bat-phone, to 424-3318. The call was unanswered. Fifty minutes later, King received a call from 424-3318, and investigators recognized the caller's voice as that of the appellant. King asked the appellant, "You go by dudes?" The appellant said no, and King stated, "Well just find out, cause' I ain't going to be able to hit dude tonight. And let me know." Officer Taylor stated that although the conversation was short and "seemingly innocent," investigators thought the call was significant because "King used his seldom used bat-phone, 818-2839, (there have been only 40 completed calls the first 20 days of the interception) to attempt to call Vernon Lockhart on a telephone number previously unknown to the investigators." Also, the fact that the appellant did not use his regular telephone and called King's bat-phone, "indicates that while the nature of the call appears innocent, the meeting with 'dude', must have some connection to their drug trafficking or Lockhart and King would not have felt the need to use their bat-phones to communicate." The application noted that the conspirators' extensive use of bat-phones had been documented in many of the previous wiretap applications and that the court already had issued three applications for telephones believed to be used as bat-phones by the appellant.

-34-

As to the appellant's claim that the wiretap application failed to establish the subscriber for the target phone or that the target phone was commonly used by the appellant, King called the target number, but no one answered. Fifty minutes later, the appellant telephoned King from the target number. Investigators, who had been monitoring the appellant's regular telephone for almost six months, recognized his voice. Nothing in the appellant's conversation with King indicated that King had been trying to contact anyone other than the appellant or that the target phone was normally used by anyone other than the appellant. Therefore, we conclude that the application set forth a substantial basis for the issuing court to conclude that the appellant commonly used the target phone.

As to whether the application established probable cause to believe communications concerning the offense would be obtained through the wiretap, Officer Taylor asserted in the application that the conspirators were using bat-phones to communicate with each other about the drug operation. Given that King made a call to the appellant from King's rarely-used bat-phone and that the appellant returned King's call from a phone number unrecognized by the investigators, we again conclude that the application set forth a substantial basis for the issuing court to conclude that communications related to the offense would be obtained through the wiretap.

## B. GPS Tracking

The appellant contends that the trial court erred by denying his motions to suppress evidence obtained as a result of the illegal attachment of GPS devices on his Pyramid truck and his Range Rover and the illegal GPS tracking of Cheyenne Davis's cellular telephone. The State claims that the trial court properly denied the motions. We agree with the State.

### 1. Pyramid Truck

The record reflects that on March 18, 2009, Officer John Cotsonas, who was assigned to the DEA in Tucson, Arizona, filed an affidavit in the Pima County Superior Court to obtain a search warrant for storage unit A23 at the U Store It on Oracle Road. In the affidavit, the officer stated that about 7:30 p.m. on February 25, 2009, Agent Haws located the Pyramid truck and trailer at the Hampton Inn in Tucson and "affixed a Global Positioning System (GPS) tracker to the underside of the white Pyramid Engineering truck." About one hour later, "utilizing the GPS tracking device information, SA Haws observed that the white Pyramid Engineering truck appeared to be located at the U Store It storage facility[.]" Based on that and other information contained in the affidavit, the court issued a search warrant for the storage unit, resulting in the discovery of the blue Shop-Vac, the blue tarp, hand cleaner, the empty box for a seven-inch polisher and sander, and the white plastic bag containing blue gloves.

-35-

On January 23, 2012, about one year before the appellant's trial, the United States Supreme Court filed United States v. Jones, 132 S. Ct. 945, 946 (2012), in which it held that the government's installation of a GPS device and use of the device to monitor a vehicle's movements constituted a search under the Fourth Amendment to the United States Constitution. Four days later, Assistant District Attorney General John Zimmerman sent an email to defense counsel, advising them that the Arizona DEA had placed the GPS tracker on the Pyramid trailer while the truck and trailer were in Tucson on February 25, 2009, and "[w]hen the tracker signal was activated, . . . it produced one signal . . . and then ceased transmitting, causing the agents to presume that the trailer (and truck) were inside a storage unit that prevented the tracker from sending a GPS satellite signal." General Zimmerman then stated in the email, "The State does not intend to introduce any evidence of the tracker, the failure to produce a signal, or that it was emplaced upon the trailer, unless the defense opens the door to such evidence."

On June 21, 2012, defense counsel filed a motion to suppress evidence discovered as a result of the GPS tracking device based on Jones, claiming that Jones required a showing of probable cause in order for the government to attach and monitor the GPS device. The State responded that the appellant lacked standing to challenge the attachment of the GPS device to the truck. However, the State conceded that the attachment of the device violated the Fourth Amendment and agreed not to introduce any evidence derived from the device at trial. On August 6, 2012, the Davidson County Criminal Court filed an order denying several motions to suppress filed by the appellant. In a footnote, the court noted that the although the State was claiming that the appellant did not have standing to challenge the attachment of the GPS device to the Pyramid truck, "the State also agreed it would not introduce any evidence derived from the attachment of said GPS." The trial court's order did not address the issue further.

On January 14, 2013, the first day of trial, defense counsel filed a motion in limine pursuant to Jones, requesting that the court "instruct the State and the State's witnesses not to refer to any evidence related to a 'U-Store It' facility in Tuscon Arizona." In the motion, counsel alleged that "the U-Store [I]t facility was discovered, and subsequently searched, based on a GPS tracking device that was placed by law enforcement on a truck and trailer driven by Cheyenne Davis." Before the first witness testified, the parties discussed the issue with the trial court, and the following exchange occurred:

> [DEFENSE COUNSEL]: Judge, I understand that they are going to introduce proof about a receipt from the U-Store-It and a phone call where Mr. Lockhart pays for the bill. But the basis of our motion to suppress the GPS on the truck was the fact that we wanted to exclude the evidence about the truck

being at the U-Store-It in Arizona. The State said on a number of occasions that they did not intend on using any evidence in the trial that would have come from that GPS tracker. So I think the question then is what do they say came from that. And maybe we have a differing opinion on that.

. . . .

And as long as the Court and the State [are] in agreement that we would have a jury-out hearing, I anticipate that they're going to put on Special Agent Haws from Arizona who is going to testify about this based on some testimony [from] Agent Bilyeu that we had in Wilson County. I anticipate that we would have to have this jury-out hearing. We wanted to make sure that the Court was aware of our position so that the State wasn't going to refer to this truck being at the U-Store-It in their opening statement.

THE COURT: Well, now, that's -- I'm hearing two different things. Just being at the facility, if they visually saw it there, that doesn't have anything to do with the GPS tracking device.

[DEFENSE COUNSEL]: Well, our position is that based on the affidavit and the search warrant from Arizona and the reports written by the officers that it was the tracking device that led them to the U-Store-It facility.

Subsequently during the trial, the State requested the jury-out hearing referred to by defense counsel, and the trial court stated, "Now the issue is how they got the information . . . about the storage unit, right?" The State answered, "Well, yes, Your Honor. If The Court will recall the Affidavit -- go ahead, Agent Haws." Agent Haws testified that on February 25, 2009, Agent Bilyeu contacted him and told him that the Pyramid truck was in the Tucson area. Agent Haws looked for the truck and found it parked at the Hampton Inn. Agent Haws advised Agent Bilyeu that he had found the truck and called for additional agents "so we could surveil the truck if it should leave." Agent Haws said that the truck left the Hampton Inn later that evening and that he physically followed it to the U Store It storage facility. However, he lost sight of the truck when it entered the facility. The State asked if he knew on February 25 that a GPS tracking device was on the truck, and he stated as follows:

I was aware -- I wasn't aware if there was or not, I wasn't sure.
I forgot if I -- I don't want to say forgot, but I was unsure if
there was. I believed there was but I can't recall for sure. I was
able to gain the location via the pings on the telephone from
agents here in Nashville. I wasn't using any laptop with
tracking software or anything.

. . . .

Once it turned into U Storage we had no visual on it because
there is a wall all of the way around. I just let [Agent Bilyeu]
know it was in there, and she identified that for sure the phone
was in the back corner of the U Storage location.

On cross-examination, Agent Haws testified that he did not remember if he was aware
of the storage unit prior to February 25. Regarding whether he placed a tracking device on
the truck prior to following it from the hotel, he stated, "I was unsure if there [was] or there
wasn't. I had forgotten if I had put it on there. I remember being around the vehicle and
going under it, but I just can't remember if I put the GPS on it or not. . . . I believe I did
because I got dirty, but I'm not 100 percent. I don't want to say I'm 100 percent sure I did."
As to whether he used a GPS signal to track the truck from the hotel to the storage facility,
he stated that he always used his laptop computer to track GPS signals, that he did not have
his laptop that night, and that he did not have any way to monitor the tracker even if he put
it on the truck. Agent Haws said that he did not tell Officer Cotsonas that he installed a GPS
device on the truck and that "I don't know why he would write that."

The trial court accredited Agent Haws's testimony that he physically followed the
truck from the hotel to the storage facility. Agent Haws later testified for the jury that he
followed the white Pyramid truck from the Hampton Inn to U Store It. Agent Brown testified
for the jury about executing the search warrant on unit A23 and finding the items inside the
unit.

The appellant first contends that the Arizona court issued the search warrant in
violation of the Fourth Amendment and Jones because it was based on information seized
from the illegal attachment of the GPS device to the truck; that the trial court should have
suppressed the evidence obtained from the illegal search of the storage unit; and that, in
determining the validity of the warrant, the Davidson County Criminal Court could consider
only the information contained in Agent Cotsonas's sworn affidavit. However, the appellant
is confusing two separate issues: the admissibility of evidence concerning the existence of
the storage unit versus the admissibility of the evidence found inside the storage unit

pursuant to the search warrant. Prior to the jury-out hearing, the trial court clarified that the issue for the hearing was limited to whether the DEA used the GPS tracking device to discover the storage unit. Defense counsel agreed that a jury-out hearing with Agent Haws was necessary in order for the trial court to make that determination. See Tenn. R. App. P. 36(a). The appellant never requested a definitive ruling on the validity of the search warrant, and the trial court never addressed the issue. Given that the trial court was not determining the legality of the search warrant, the court was not bound by the information contained in the four corners of the warrant application and could consider Agent Haws's testimony. See State v. Keith, 978 S.W.2d 861, 870 (Tenn. 1998) (stating that "in determining whether or not probable cause supported issuance of a search warrant only the information contained within the four corners of the affidavit may be considered" (citing Jacumin, 778 S.W.2d at 432).

The appellant contends that Agent Haws was not credible because of "the inconsistent and forgetful nature" of his jury-out testimony. We agree with the appellant that Agent Haws's stating that he remembered going to the trouble of crawling underneath the truck but that he did not remember if he placed a GPS device on it is highly suspect.[5] However, the issue here turns on the agent's credibility that he tracked the truck visually and did not use the GPS device. The trial court found Agent Haws credible on that point, noting his testimony that he did not have his laptop with him to track the truck even if he placed the GPS device on it. Nothing preponderates against the court's finding that Agent Haws visually followed the truck to the storage facility.

As to the appellant's claim that the Arizona court issued the search warrant in violation of the Fourth Amendment and Jones and, therefore, that the trial court should have suppressed the items found as a result of the search, we note that Agent Cotsonas applied for and received the search warrant ten days after the March 8, 2009 take-down and search of the appellant's properties. In his affidavit, Agent Cotsonas provided additional information, aside from the tracking of the GPS device, to link the appellant and the drug conspiracy to storage unit A23, stating that the search of the appellant's home had revealed documents showing that the appellant rented storage unit A23 in December 2008 under the name Division 4 Development. Agent Cotsonas also stated that based on his training and experience, such facilities were often used to conceal and store marijuana, scales, packaging, drug paraphernalia, drug records, the names and addresses of co-conspirators, and cash proceeds from drug sales. Therefore, the search warrant was not issued based solely on the information obtained from the attachment and monitoring of the GPS device.

---

[5]The State concedes in its brief that "the DEA placed the tracking device on the truck without first obtaining a warrant."

In any event, the appellant's brief characterizes the evidence found in the storage unit as "extremely prejudicial." We disagree. The agents did not find marijuana, cash, drug records, marijuana packaging, or drug paraphernalia in the unit and never offered any proof or argument as to how the blue Shop-Vac, the blue tarp, the hand cleaner, the seven-inch polisher and sander, or the blue gloves related to the drug operation.[6] The remaining evidence of the conspiracy and the possession of marijuana by the appellant was overwhelming. Therefore, even if we were to conclude that the lower court improperly issued the search warrant, we would also conclude that the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

2. Cheyenne Davis's Cellular Telephone

The appellant contends that the information contained in the affidavit underlying the search warrant for the GPS tracking of Davis's cellular telephone failed to establish probable cause that tracking the phone would reveal evidence of a crime. The State argues that the appellant lacks standing to challenge the search warrant and that, regardless, the trial court properly denied the appellant's motion to suppress. We agree with the State.

On January 23, 2009, Officer Taylor filed an application for a search warrant for 615-554-3763, "authorizing the collection by a cellular communications provider of the specific location, from time to time, of a cellular telephone by the use of the said provider's Global Positioning System." In the application, Officer Taylor stated that there was probable cause to believe that the appellant, Davis, and "others as yet unknown" were using the telephone number "in furtherance of the violations of State and Federal criminal laws, including the sale, delivery, and conspiracy to sell or deliver cocaine and marijuana." The application specifically incorporated the previous wiretap application for 615-423-5979, which was the number for the appellant's bat-phone, "and all other Applications incorporated by reference in that Application, which have been reviewed by the judge reviewing this application."

In paragraph four of the application, Officer Taylor stated as follows: On February 20, 2009, the appellant flew to Tampa, Florida. On the morning of February 24, 2009, investigators intercepted a call from 615-554-3763 to the appellant's bat-phone. Investigators believed the voice of the caller was that of Davis. During the call, Davis stated that he had obtained a room and was waiting on the appellant, and the appellant told Davis that he would be there that day. Investigators had determined through surveillance that the white pickup truck was linked to the appellant and that Davis was driving the truck. However, they did not

---

[6]Before trial, the State advised the trial court that the undercarriage of the gooseneck trailer had been painted in the storage unit and that "materials, sanders and so forth left there."

know at the time of Davis's call if Davis and the truck were in Florida or some other part of the country such as Texas or Arizona. Officer Taylor said that a search warrant would allow investigators, through the phone's GPS, "to know where the vehicle goes and track the vehicle as it returns to Tennessee. This information will aid the investigators in identifying the source(s) of drugs used to supply this conspiracy." Based on the information in the application, Judge Fishburn issued a search warrant directing T-Mobile, the cellular service provider for the phone number, to provide tracking information for the phone.

Before trial, the appellant filed a motion to suppress any evidence obtained from the use of the GPS to track Davis's phone. In support of the motion, the appellant relied on Jones and argued that the warrant application failed to establish probable cause that the use of GPS tracking would reveal evidence of a crime because the application did not allege that Davis was transporting drugs and because nothing indicated that the appellant's and Davis's trips were related to drugs or illegal activity. He also argued that the investigators failed to comply with Rule 41, Tennessee Rules of Criminal Procedure, which provides for the issuance and execution of search warrants. The State claimed that the appellant lacked standing to challenge the GPS tracking of Davis's phone and that, in any event, the phone was tracked pursuant to a court order that complied with federal and state constitutional requirements.

The trial court agreed with the State's claim that the appellant lacked standing to challenge the GPS data, stating, "While Defendant's conversations with Mr. Davis were intercepted on Mr. Davis's phone, which gives Defendant standing to challenge the wiretap interceptions, he does not have standing to challenge the GPS data retrieved from the phone since there is no proof the phone was [ever] in his possession." The trial court also held that, even if the appellant had standing, probable cause "is set forth in paragraph 4 of the application, citing to intercepted calls authorized by the previous wiretap order."

On appeal, the appellant maintains that the search warrant application for the tracking of Davis's cellular telephone failed to establish probable cause that the tracking would reveal evidence of a crime. The State maintains that the appellant lacks standing to challenge the warrant. The appellant responds that he is an "aggrieved person" with standing. We conclude that the trial court correctly determined that the appellant lacks standing to challenge the tracking of Davis's cellular telephone.

In support of his claim that he has standing to challenge the GPS tracking of the phone, the appellant relies on Tennessee Code Annotated section 40-6-304(h)(1), part of the Wiretapping and Electronic Surveillance Act, which provides,

> Any aggrieved person in any trial, hearing, or proceeding in or
> before any court, department, officer, agency, regulatory body, or

other authority of the state of Tennessee or a political subdivision of the state may move to suppress the contents of any intercepted wire, oral or electronic communication, or evidence derived therefrom, on the grounds that:

> (A) The communication was unlawfully intercepted;
>
> (B) The order of authorization under which it was intercepted is insufficient on its face; or
>
> (C) The interception was not made in conformity with the order of authorization.

As noted by the appellant, the Act defines an "aggrieved person" as "a person who was a party to an intercepted wire, oral or electronic communication, <u>or a person against whom the interception was directed</u>."  Tenn. Code Ann. § 40-6-303(2) (emphasis added).

The application for the search warrant stated that "[t]here is probable cause to believe that Vernon Lockhart, **Cheyenne Davis**, and others as yet unknown, are using mobile telephone number **(616) 554-3763**."  Therefore, pursuant to the definition of an "aggrieved person," we can appreciate the appellant's argument that he has standing to challenge the GPS tracking of Davis's phone because "the affiant, by his application, made the Appellant an aggrieved person by identifying him by name as a person against whom the interception was directed."  However, the order at issue was obtained pursuant to an application for a search warrant under Tennessee Rule of Criminal Procedure 41,[7] not an application for an order intercepting a wire, oral, or electronic communication under Tennessee's Wiretapping and Electronic Surveillance Act.  In fact, tracking devices are specifically excluded from the Act.  <u>See</u> Tenn. Code Ann. § 40-6-303(7) (providing that "electronic communication" does not include a tracking device as defined by 18 U.S.C. § 3117); 18 U.S.C. § 3117 (providing that "the term 'tracking device' means an electronic or mechanical device which permits the tracking of the movement of a person or object"); <u>United States v. Jimmie Eugene White, II</u>, No. 13-20423, 2014 WL 6682645, at *7-9 (E.D. Mich., Nov. 24, 2014) (concluding that a cell phone fits within the federal statutory definition of a "tracking device").  Therefore, the Act does not give the appellant standing to challenge the GPS tracking of Davis's phone.

---

[7]We note that unlike Rule 41 of the Tennessee Rules of Criminal Procedure, Rule 41 of the Federal Rules of Criminal Procedure specifically addresses a "tracking-device warrant."  <u>See</u> Fed. R. Evid. 41(e)(2)(C), (f)(2).

"[W]hen suppression of evidence seized pursuant to a search warrant is advocated, the burden is upon the accused to prove by a preponderance of the evidence . . . the existence of a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized." Henning, 975 S.W.2d at 298. The appellant has made no attempt to show that he had a legitimate expectation of privacy in Davis's phone. As noted by State, nothing indicates that the appellant ever used the phone or that he had a possessory or privacy interest in it.[8] Therefore, the trial court properly determined that the appellant lacked standing to challenge the GPS tracking of Davis's phone.

That said, assuming arguendo that the appellant had standing, we also conclude that the trial court properly denied the appellant's motion to suppress. Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, absent a few narrowly defined exceptions, a search must be conducted according to a valid search warrant to be reasonable. See State v. Brown, 294 S.W.3d 553, 561 (Tenn. 2009). Moreover, "a search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (quoting Jacumin, 778 S.W.2d at 431, and Moon, 841 S.W.2d at 338).

"A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." Stevens, 989 S.W.2d at 293 (Tenn. 1999). To establish probable cause

> [a]n affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched. The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence.

State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993) (citations omitted). As a general rule, "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." State v. Bryan, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)).

---

[8]At a suppression hearing, Detective Kajihara testified that the phone was subscribed to someone named Tommy Jones and that, to his knowledge, no one other than Davis ever used the phone.

In this case, the affidavit supporting the search warrant alleged that the target phone number was being used to further the sale, delivery, and conspiracy to sell or deliver cocaine and marijuana. Paragraph four also alleged that investigators had intercepted a call from the target phone number, made by Davis, to the appellant's bat-phone and that the conversation revealed Davis and the appellant were about to meet somewhere. Investigators believed that Davis was driving the appellant's white pickup truck, which had been linked to the conspiracy, that Davis was in another state with the truck, and that tracking Davis's phone would allow them to track the truck as it returned to Tennessee. Although Officer Taylor did not state in the affidavit that Davis would be transporting drugs to Tennessee, he stated that the GPS information "will aid the investigators in identifying the source(s) of drugs used to supply this conspiracy." We conclude that the trial court properly found that the affidavit established probable cause to believe that tracking the phone would result in evidence of a crime.

3. Range Rover

The appellant contends that the application to attach a GPS device to his Range Rover and track the device failed to establish probable cause that the device would reveal evidence of a crime. He also contends that investigators violated the attachment and tracking order by tracking the Range Rover during an eleven-day period in which the order was not in effect and that, pursuant to Jones, the government was required to follow the procedures set out in Tennessee Rule of Criminal Procedure 41 regarding the issuance, execution, and return of search warrants. The State argues that the application established probable cause and that the trial court correctly determined that Rule 41 did not apply to covert operations. We conclude that the appellant is not entitled to relief.

On November 13, 2008, Officer Taylor filed an "APPLICATION FOR INSTALLATION and MONITORING OF A GPS TRACKING DEVICE" on the appellant's 2006 Range Rover. The application specifically incorporated the previous wiretap application and ten-day reports for 615-289-5116, the appellant's cellular telephone. According to the application, on October 15, 2008, agents in Tucson, Arizona, were conducting surveillance on the appellant and learned through intercepted calls that the appellant was aware of their surveillance. At that point, the appellant "significantly altered his activities." On October 27, 2008, Nashville officers learned from intercepted calls that the appellant was going to meet with co-conspirators and attempted to follow him. However, the appellant, driving the Range Rover, began using tactics to check for surveillance. Intercepted calls later revealed that the appellant believed he was being followed. Officer Taylor stated that "[s]ince October 27, 2008, investigators attempted surveillance of [the appellant] and he made the same evasive maneuvers." Officer Taylor said he believed the appellant was using the Range Rover to facilitate drug dealing and that the GPS device would aid investigators in conducting

-44-

surveillance without jeopardizing the investigation. He requested that investigators be allowed to install the GPS device and track the Range Rover for sixty days. On November 13, the trial court issued an order authorizing the installation and tracking of the GPS device. On January 23, 2009, Officer Taylor filed an application for continued monitoring of the GPS tracking device, and the trial court issued the order that same day.

Before trial, the appellant filed a motion to suppress evidence obtained from the GPS tracking device. At a hearing on the motion, Detective Kajihara testified that on November 14, 2008, a DEA agent installed the tracker on the Range Rover when the appellant brought the vehicle to the Land Rover dealership for service. The device was wired into the vehicle's battery and provided "realtime and historical data" to a laptop computer in the wiretap room. On cross-examination, counsel asked if the device was used to stop and arrest the appellant in Lakewood on March 8, 2009. Detective Kajihara answered, "Initially we did use the GPS, but we also had surveillance observe him pulling into 6960 Old Hickory Boulevard at which point we knew he was coming back towards Dickerson Road." He said investigators also used the device "at some points" to determine if the appellant was at the residence on Pulley Road.

The trial court ruled that the "warrant" for the tracking device was signed by a neutral and detached magistrate; that the application set forth seven paragraphs establishing probable cause, "namely that wiretap interceptions alerted law enforcement about large quantities of drug deliveries"; and that the application and "order" identified the target vehicle and its vehicle identification number. Regarding the procedural requirements of Tennessee Rule of Criminal Procedure 41, the trial court concluded that the Rule's requirements were not required by the federal or Tennessee constitutions and that the Rule did not apply when law enforcement was seeking a "covert and investigative warrant consistent with the Fourth Amendment." At trial, the proof showed that the GPS tracker resulted in the discovery of the appellant at the Pulley Road residence with Jeremiah Robertson on March 4, 2009. The tracker also showed that the appellant went to 6960 Old Hickory Boulevard just before the Lakewood police officer stopped him in the early morning hours of March 8, 2009.

As to whether the application established probable cause for installation of the tracking device, the appellant contends that the wiretap applications incorporated by reference failed to show that the vehicle was involved in drug activity or that placement of the GPS device would lead to discovery of a crime. We disagree. We have already determined that the wiretap application for the appellant's cellular telephone created a substantial basis for the issuing court to find probable cause that the appellant was involved in a drug conspiracy. Moreover, the application at issue provided that intercepted calls revealed that the appellant was going to meet with co-conspirators. However, when investigators tried to follow the appellant's Range Rover to the meeting, the appellant began checking for surveillance. Later

that day, an intercepted call confirmed that the appellant knew he was being followed. When investigators subsequently tried to follow the appellant in the Range Rover, he made "evasive maneuvers" to thwart that surveillance. We conclude that the trial court did not err in determining that the affidavit established probable cause that the appellant was using the Range Rover in the drug operation or that tracking the Range Rover would result in evidence of a crime.

The appellant also claims that the investigators violated the order by tracking the Range Rover during an eleven-day period, from January 12, 2009, to January 23, 2009, in which no tracking order was in effect. However, he has failed to allege what prejudicial evidence, if any, was obtained during that time. See Tenn. R. App. P. 36(b). We note that neither the Pulley Road incident nor the appellant's pulling into the driveway at 6960 Old Hickory Boulevard occurred during the eleven-day period.

The appellant claims that Jones required the government to comply with Tennessee Rule of Criminal Procedure 41. However, the requirements of Rule 41 apply only to search warrants. Although the trial court referred to the order at issue as a "warrant," the order was not a search warrant. First, unlike the application filed by Officer Taylor for the GPS tracking of Davis's cellular telephone, which was titled "APPLICATION FOR SEARCH WARRANT," the application he filed for the installation and tracking of the GPS device on the Range Rover was titled "APPLICATION FOR THE INSTALLATION and MONITORING OF A GPS TRACKING DEVICE." Second, the former application stated that it was being filed pursuant to Tennessee Rule of Criminal Procedure 41, but the latter application cited to no legal authority. Third, the search warrant issued for the tracking of Davis's phone was titled "ORDER and Search Warrant" and stated that it was being issued pursuant to Rule 41, but the order for the GPS installation and tracking of the Range Rover was titled "ORDER AUTHORIZING the INSTALLATION and MONITORING OF A GPS TRACKING DEVICE" and stated that it was being issued pursuant to Tennessee Code Annotated section 16-10-101.[9] Finally, and most significantly, the warrant for the tracking of Davis's phone shows that the warrant was served on T-Mobile and shows a return of the warrant. The order for the GPS installation and tracking of the Range Rover was neither served on a party nor returned.

Although the appellant contends that Jones required that the application for installation and tracking of the GPS device establish probable cause, he does not argue that Jones required the government to obtain a search warrant. We note that in Jones, the United States Supreme

_____

[9] Tennessee Code Annotated section 16-10-101 provides, "The circuit court is a court of general jurisdiction, and the judge of the circuit court shall administer right and justice according to law, in all cases where the jurisdiction is not conferred upon another tribunal."

Court held that the government's installation of a GPS device and use of the device to monitor a vehicle's movements constituted a search under the Fourth Amendment but that the Court noticeably stopped short of stating that the search required a warrant or some standard of suspicion. In the instant case, the trial court determined that the order was signed by a neutral and detached magistrate, that the application for the order established probable cause, and that the application sufficiently identified the target vehicle. Therefore, we cannot say that the installation and tracking of the GPS device on the Range Rover, without a search warrant, ran afoul of Jones.

## C. Search of 5225 Rustic Way

The appellant contends that the trial court erred by denying his motion to suppress evidence obtained from the search of his home because the search warrant was unconstitutionally broad in that it failed to describe with particularity the items to be seized and the crimes for which the items were sought and because the application for the warrant failed to provide probable cause that the items to be seized were contraband, evidence, or proceeds from criminal activity. The State argues that the trial court properly denied the motion to suppress. We agree with the State.

In the early morning hours of March 8, 2009, Officer Michael Perez of the drug task force filed a fifteen-page affidavit in support of a search warrant for 5225 Rustic Way in Wilson County. On the first page of the affidavit, he stated that there was probable cause to believe that the appellant was in violation of the Tennessee Drug Control Act of 1989, the Racketeer Influenced and Corrupt Organization Act of 1989, and the Money Laundering Act of 1996. He also stated that

> the evidence to be searched for is as follows: All controlled substances, controlled substances paraphernalia, scales and mixing devices, packaging materials, any equipment, devices, records, computers and computer storage discs, to include the seizure of computers to retrieve such records, books or documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances, or recording transactions involving controlled substances, any indicia [of] ownership, dominion, or control over the premises to be searched including rental receipts, mortgage payments, utility bills, photographs of any persons involved in the criminal conduct, all financial records pertaining to the disposition of the proceeds of the violation of the criminal laws specified above, and all of the above records, whether stored on

paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices . . . , and any goods or personal property, including US currency or negotiable instruments, constituting proceeds of a violation of the aforesaid laws or funds used to facilitate the same, firearms, . . . and other weapons, and any evidence or items which would be used to conceal the foregoing or prevent its discovery.

Officer Perez then listed seventy-nine paragraphs in support of probable cause in which he set out much of the facts regarding the conspirators and the investigation of the drug operation. He stated that intercepted calls and surveillance had revealed that the appellant owned 5225 Rustic Way, even though the home was in Julie Draper's name, and that co-conspirators had gone to the home. He also stated, in pertinent part, as follows:

14. On January 28, 2009, Jeffrey King used telephone 615-818-2839 to talk to Austin Lea on Lea's direct connect phone. They made arrangements for King to come to Lea's house at 100 Southfork Drive in Lebanon to arrange for a marijuana purchase. Surveillance showed that Jeffrey King was driving Vernon Lockhart's Range Rover on Jan 28, 2009 and that Lockhart was driving Jeffrey King's Chevrolet pick up truck. Immediately following the transaction, surveillance showed Jeffrey King go to **5225 Rustic Way, Old Hickory** from 100 Southfork Drive in Lebanon and exchange vehicles with Lockhart.

. . . .

25. On February 6, 2009, Lockhart talked to [an unidentified male, "UM"] who was using telephone number 615 589-6360. Lockhart and the UM argued about one of Lockhart's associates not delivering as promised. The UM was upset because some of his customers were calling and he had nothing to give them. The UM told Lockhart that first someone would break their neck to bring that shit and now he had to wait. Lockhart told him to wait. Lockhart asked the UM if he (UM) was upset because the UM paid for it. Lockhart told the UM that he would give him (UM) his money back.

26. On February 7, 2009, Lockhart talked to Alexi Smith on the phone more than once. During one of the calls, Lockhart asked

Smith if he talked to Skinny (Omar Ellis). Lockhart told Smith to bring that with him. Surveillance showed Alexi Smith at **6960 Old Hickory Boulevard, Whites Creek**. Later in the day Smith and Lockhart talked again and Smith told Lockhart that he brought that duffel bag of clothes to wash. Surveillance show[ed] that Smith was at Lockhart's house at **5225 Rustic Way, Old Hickory** when this call was made.

27. On February 7, 2009, a short time after Alexi Smith arrived at **5225 Rustic Way**, Lockhart called the UM referenced above and told him that dude (Alexi Smith) was there if he wanted to come over. Investigators believe UM was coming over to get Narcotics. The UM told Lockhart that he was going to be a minute.

28. On February 7, 2009, Lockart talked to the UM again. Lockhart said that he was at his house **(5225 Rustic Way)**. The UM said he may stop through. Lockhart asked if he already had the number together. Investigators believe that Lockhart was referring to money. About an hour later the UM called Lockhart and told Lockhart to tell "dude" (Alexi Smith) to come on. Lockhart said that he was already gone and told UM to come to **5225 Rustic Way**. Later in the evening, Lockhart and the UM talked again and Lockhart asked what the count was on that. Investigators believe Lockhart was referring to money. The UM said that he had not counted it yet.

. . . .

68. On March 4, 2009, surveillance placed Omar Ellis and Vernon Lockhart together at Encore condominiums in Nashville. Surveillance then followed Lockhart and Ellis to **2540 Pulley Road, Nashville**. Surveillance followed Vernon Lockhart and Jeremiah Robertson from **2540 Pulley Road** to **5225 Rustic Way in Old Hickory**. While surveillance was ongoing, several telephone calls were intercepted and recorded from Vernon Lockhart's phone 615-423-5979. Some of these calls were to a UM using 615-481-5438 that prior surveillance showed was living at **2412 Pleasant Springs Lane in Hermitage**. Investigators believe it was clear from listening to these calls that

-49-

Lockhart got some marijuana at **2540 Pulley Road** and that Jeremiah Robertson transported it to **5225 Rustic Way** in Jeremiah Roberston's car which is a silver 2004 Dodge Stratus bearing Tennessee registration plate 730 VFL. Investigators believe that the UM was going to go to **5225 Rustic Way in Old Hickory.**

69. On March 4, 2009, surveillance was established on **2412 Pleasant Springs Lane, Hermitage**. Surveillance saw the UM referenced . . . above leave **2412 Pleasant Springs Lane** in a gray Chrysler Sebring with a temporary tag on it and go to **5225 Rustic Way**. Surveillance was able to see the UM and Lockhart at **5225 Rustic Way** and to see Jeremiah Robertson's vehicle, a black pick up truck, Vernon Lockhart's Range Rover and the UM's vehicle at **5225 Rustic Way in Old Hickory**.

70. On March 4, 2009, surveillance showed Jeremiah Robertson and the UM leave **5225 Rustic Way, Old Hickory**. Surveillance followed both vehicles. Surveillance followed Robertson to Springfield, Tennessee. The UM and Lockhart talked on Lockhart's phone and the UM told Lockhart that he was not going to take any of it.

71. On March 4, 2009, intercepted calls on Vernon Lockhart's phone showed that Robertson was going to meet Omar Barbee in Springfield. Surveillance also followed the UM driving the Chrysler Sebring to **2412 Pleasant Springs Lane in Hermitage**. A short time later the UM left **2412 Pleasant Springs Lane** and was stopped for a traffic violation. The UM was identified as Andre White . . . . When White was stopped, he told the Officer he lived at 2312 Pleasant Springs. Surveillance has observed Andre White leave **2412 Pleasant Springs Lane** on multiple occasions. Through the phone conversations and surveillance, investigators believe Andre White is living at **2412 Pleasant Springs**.

. . . .

73. On March 4, 2009, Lockhart talked to Chad Durham using telephone 615-423-5979. They made arrangements for Durham

to go to **5225 Rustic Way in Old Hickory** to get ten pounds of marijuana out of a black truck that Lockhart had parked in the driveway. Surveillance was able to see Durham arrive and go to the truck. Surveillance followed Durham from **5225 Rustic Way** to the area of **128 Champney Court in Goodlettsville**.

. . . .

76. On March 5, 2009, Andre White and Vernon Lockhart talked on Vernon Lockhart's 615-423-5979 phone. White told Lockhart that he had been pulled over after he left Lockhart's house. Lockhart and White talked again on March 5, 2009 and argued about money that White owed Lockhart for drugs.

Officer Perez stated that based on the information contained in the affidavit, he believed the appellant was selling large quantities of drugs and requested a search warrant for the residence in order to locate evidence including, but not limited to, narcotics; cash from drug sales; names and addresses of co-conspirators; drug records; and scales, packaging, and other drug paraphernalia. He also stated that based on his training, experience, and participation in other financial investigations involving large amounts of cocaine and marijuana, drug dealers often kept records of the drug operation in their homes, that they often hid contraband in their homes, and that they often concealed proceeds of their criminal activity in their homes.

The Wilson County Circuit Court issued a search warrant, authorizing a search for personal property listed on the first page of Officer Perez's affidavit. A property receipt shows that law enforcement seized 164 items during the search, including furniture, stereo equipment, tools, televisions, an ice maker, two Louis Vuitton handbags, golf clubs, a faucet, jewelry, a vacuum cleaner, a clothes washer, a clothes dryer, filing cabinets, a fax machine, currency, marijuana, cellular telephones, and nine surveillance cameras.

Before trial, the appellant filed a motion so suppress the evidence. Relevant to this appeal, he argued that the warrant application failed to establish probable cause that evidence of a crime would be found in his residence. The trial court denied the motion, noting that the warrant application for 5225 Rustic Way relied heavily on information obtained through the wiretap interceptions, which the appellant had already challenged in a separate motion to suppress and the trial court had denied. The trial court ruled that the information obtained through the wiretaps as well as the physical surveillance set forth in the seventy-nine paragraphs of Officer Perez's affidavit established probable cause for the search.

Subsequently, the appellant filed a supplemental motion to suppress the evidence, arguing that the search warrant was overly broad in that it did not limit the items that could be seized and, therefore, authorized an unconstitutionally general search. In the motion, the appellant noted that, during the search, law enforcement seized every piece of furniture, a microwave, a vacuum cleaner, children's toys, jeans, coats, belts, handbags, a washer, and a dryer. The trial court denied the motion, stating as follows:

> The Court finds the language employed in the affidavit at issue to be distinguishable from the cases relied on by the defense, State v. Johnson, 854 [S.W.2d] 897, 901 (Tenn. Crim. App. 1993), where the search warrant simply used the term "drugs," and United States v. Bianco, 998 F.2d 1112 [(2nd Cir. 1993)], where the warrant authorized seizure of notes, ledgers, etc. without limitation or reference to the suspected crime in that case (i.e., loansharking). Here, the 15-page affidavit provides an explicit description of the crimes suspected (i.e., conspiracy to deliver, sell, and possess over 700 pounds of marijuana and 300 grams of cocaine) . . . . The fact [that] the statues criminalizing money laundering are not included as well is not fatal to the warrant. Regardless, the Court notes that the first page of the affidavit provides limiting language of the electronic and paper documents sought, which not only distinguishes this case from Bianco but also indicates concern that funds obtained through drug sales had been laundered. An excerpt from this limiting language reads as follows: ". . . documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances, or recording transactions involving controlled substances, any indicia of ownership, dominion, or control over premises to be searched including rental receipts, mortgage payments, utility bills, photographs of any persons involved in the criminal conduct, all financial records pertaining to the disposition of proceeds in the violation of the criminal laws specified above . . . ."

As to the appellant's claim that the search warrant was overly broad, the Fourth Amendment requires that a search warrant contain a particular description of the items to be seized. See Henning, 975 S.W.2d at 296. Moreover, article I, section 7 of the Tennessee Constitution prohibits general warrants, and Tennessee Code Annotated section 40-6-103 requires that search warrants "particularly describ[e]" the property to be searched. In order to satisfy the particular description requirement, a warrant "'must enable the searcher to

reasonably ascertain and identify the things which are authorized to be seized.'" State v. Meeks, 867 S.W.2d 361, 372 (Tenn. Crim. App. 1993) (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)).  Our supreme court has observed,

> Where the purpose of the search is to find specific property, [the property] should be so particularly described as to preclude the possibility of seizing any other [property]. . . . [I]f the purpose [of the warrant is to seize] . . . any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

Lea v. State, 181 S.W.2d 351, 352-53 (Tenn. 1944).  "A general order to explore and rummage through a person's belongings is not permitted.  The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Cook, 657 F.2d at 733.

The search warrant at issue specifically referenced the three criminal acts mentioned in the affidavit and the corresponding sections in our criminal Code.  The warrant also tracked the language in the affidavit, instructing officers to seize

> [a]ll controlled substances, controlled substances paraphernalia, scales and mixing devices, packaging materials, any equipment, devices, records, computers and computer storage discs, to include the seizure of computers to retrieve such records, books or documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances, or recording transactions involving controlled substances, any indicia [of] ownership, dominion, or control over the premises to be searched including rental receipts, mortgage payments, utility bills, photographs of any persons involved in the criminal conduct, all financial records pertaining to the disposition of the proceeds of the violation of the criminal laws specified above, and all of the above records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices . . . , and any goods or personal property, including US currency or negotiable instruments, constituting proceeds of a violation of the aforesaid laws or funds

-53-

used to facilitate the same, firearms, . . . and other weapons, and any evidence or items which would be used to conceal the foregoing or prevent its discovery.

As noted by the State, this language is almost identical to the language contained in the search warrant at issue in State v. Thomas Eugene Davis, No. E2008-02741-CCA-R3-CD, 2010 WL 98886, at *6 (Tenn. Crim. App. at Knoxville, Jan. 12, 2010). In concluding that the trial court correctly found that the search warrant sufficiently particularized the items to be seized, this court stated,

> The search warrant was issued in order to seize items related to the trade of controlled substances, which officers suspected to have occurred on the Defendant's property. The warrant authorized officers to seize a long list of items, which generally included controlled substances, tools for the use and sale of controlled substances, and records of the sale of controlled substances. The warrant does not give a particular description of any of the items authorized to be seized. The absence of a more particularized description does not make the warrant a general warrant, however, because a warrant to seize property that is illicit by reason of its character need not provide a specific description of each item to be seized. See Lea, 181 S.W.2d at 352-53; also see State v. Ronald C. Floyd, No. E2001-03044-CCA-R3-CD, 2003 WL 21946737, at *3-4 (Tenn. Crim. App., at Knoxville, Aug. 12, 2003) (holding that a warrant that authorized officers to seize illegal drugs and their proceeds was not a general warrant), no Tenn. R. App. P. 11 application filed. We conclude the warrant in this case enabled the executing officers "to reasonably ascertain and identify the things which are authorized to be seized." See Meeks, 867 S.W.2d at 372. As such, the Defendant is not entitled to relief on this issue.

Davis, No. E2008-02741-CCA-R3-CD, 2010 WL 98886, at *6. Accordingly, we conclude that the items introduced into evidence at trial in this case were described with sufficient particularity in the search warrant.

The appellant also contends that the affidavit for the warrant failed to provide a nexus between the criminal activity and the items seized. We recognize that an affidavit must show a nexus between the criminal activity, the place to be searched, and the items to be seized in order to give a magistrate probable cause to issue a warrant. State v. Reid, 91 S.W.3d 247,

273 (Tenn. 2002); Smith, 868 S.W.2d at 572. If an affidavit contains no direct evidence of such a nexus, then "[w]e must . . . determine whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. State v. Saine, 297 S.W.3d 199, 206 (Tenn. 2009). In Saine, our supreme court found that an affidavit, indicating that officers had observed the defendant leave his residence to go to a drug purchase and immediately return to his residence, could lead a magistrate reasonably to infer that drugs were located in the defendant's residence. Id. at 206. The court concluded that the inference was further supported by the officer stating in the affidavit that, in his experience, "drug dealers ordinarily keep their drugs, the proceeds of drug sales, and financial records related to their business in their residences." Id. Noting that the probable cause determination of a neutral and detached magistrate should be given great deference by a reviewing court, our supreme court concluded that "the facts contained in the application for the search warrant established a substantial basis on which the magistrate could conclude that evidence of Mr. Saine's drug trafficking would be found inside his residence." Id. at 207.

Turning to the instant case, we agree with the trial court that the affidavit established probable cause. The affidavit stated that on March 4, 2009, officers witnessed Jeremiah Robertson transfer marijuana from Pulley Road to 5225 Rustic Way. They also heard the appellant and Chad Durham make arrangements for Durham to pick up ten pounds of marijuana at the home. After the conversation, surveillance showed that Durham arrived and got marijuana out of a black truck that was parked there. Additionally, as in Saine, Officer Perez asserted in the affidavit that in his experience as a law enforcement officer, drug dealers often kept documents, monies, and contraband relating to drug transactions in their residences. Therefore, we conclude that the trial court properly denied the appellant's motion to suppress.

## D. Expert Testimony

The appellant contends that he is entitled to a new trial because the trial court improperly allowed Detective Kajihara to testify as an expert in the interpretation of drug ledgers. The appellant claims that Detective Kajihara's experience was insufficient to qualify him as an expert, that his testimony did not substantially assist the jury, and that his testimony was extremely prejudicial to the defense. The State argues that the trial court properly allowed Detective Kajihara to testify. We agree with the State.

Prior to Detective Kajihara's testimony, the appellant objected to his being "certified as an expert and talk about these drug ledgers." During Detective Kajihara's direct testimony, he stated that he began working for the MNPD in 2003 and that he worked for the department's drug task force from 2003 to 2010. He said that he had a bachelors degree in aerospace administration from Middle Tennessee State University and that, since joining the police department, he had attended "numerous schools from domestic violence, gang related,

and over twenty narcotic related schools from the basic . . . narcotic investigator from DEA to advanced DEA investigations and financial crimes such as money laundering."

Later, the trial court held a jury-out hearing in order to address the appellant's objection to Detective Kajihara's testifying about the drug ledgers. In the hearing, the State asked if Detective Kajihara had any formal training in the identification and analysis of drug ledgers, and he answered, "Through experiences and through some teaching, yes. . . . There's nothing specific when they teach you. They show you what drug ledgers look like, but you figure through experience how to interpret those drug ledgers, yes." He stated that different drug organizations used different drug ledgers but that

> there's usually a common denominator. Like they'll say thirty-three means thirty-three pounds, and then they'll put a total.
>
> . . . .
>
> I'm sorry, total cost. Or they might keep a running tally of how many pounds, or they may say thirty-three at $750 equals this. Just depending on -- I mean, that's just an example. That's when you're dealing with marijuana.

Detective Kajihara testified that drug dealers had to use ledgers in order to keep track of "what's called fronting." He explained that drug dealers "give the product out first, which allows the person to pay you back afterwards. Because most people don't have the money right away to give you to pay for the product. So you have to keep track of how much you actually gave out so you know how much money these people owe you[.]" He said that he had testified about the interpretation of marijuana ledgers in the case of Chris Tuttle and that Tuttle ultimately pled guilty and received a forty-year sentence. Regarding the instant case, Detective Kajihara said he examined various "pieces of paper" found at 5225 Rustic Way and selected thirteen drug ledgers for the State to use as exhibits at trial. The State asked how he chose the exhibits, and he explained, "Some of them didn't have pounds on them, or it was just [hard] to interpret. So I just didn't include them. But they are drug -- the majority of them are drug ledgers. . . . I just tried to pick the easier ones that I could interpret." He stated that the ledgers were of two different types in that "one ledger is the amount that comes in or your load amount. The other amount is the ledger amount. And that corresponds to your different customers or distributors if you want to say, how much they owe you." Detective Kajihara prepared a table for trial, summarizing from the thirteen ledgers the total load amounts in pounds of marijuana received by the appellant, the total amounts in pounds of marijuana the appellant sold to distributors, and the amounts of money the distributors owed the appellant.

On cross-examination, Detective Kajihara testified that he had never taken a class on the interpretation of drug ledgers but that "I attended classes that show figures and then you look at them and you can figure it out. But, no, I haven't specifically sat down with an instructor and the instructor said this is what you need to do." Defense counsel asked if he knew of any publications "about this sort of thing," and he stated, "There probably is, but I . . . haven't looked at one." Regarding the Tuttle case, he said he found the ledgers in a notebook in 2004 or 2005 and testified about them in a suppression hearing. However, he acknowledged that he did not testify as an expert in that case.

The trial court noted that in order to be admissible, an expert's testimony had to substantially assist the trier of fact. The trial court stated that the appellant's handwritten notes were relevant to the jury determining whether a large amount of marijuana was in the appellant's control and that the detective's testimony about the ledgers would substantially assist the jury in making that determination. The trial court noted the lack of peer review and publications available on the subject but stated that Detective Kajihara's "knowledge and talking to people in the field, that's a way of gathering information." The trial court ruled that the detective could testify as an expert about the drug ledgers. When his direct examination resumed for the jury, Detective Kajihara testified in detail about the thirteen ledgers. The State introduced copies of the ledgers and the table prepared by Detective Kajihara into evidence. All of the ledgers were hand-written on various pieces of paper such as post-it-notes or notebook paper. Two of the ledgers were written on pages torn out of a personal calendar, and one ledger was written on the bottom of an advertisement letter from Vonage.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987); see Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005).

This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).  As noted by the appellant, "when the State establishes that an officer possesses the necessary training, experience, and familiarity with the illicit drug trade, the officer may testify about matters relating to the business of buying, selling, trading and use of illegal drugs pursuant to Rule 702." State v. Elliott, 366 S.W.3d 139, 147 (Tenn. Crim. App. 2010).

In this case, Detective Kajihara testified that he had attended more than twenty narcotic-related schools "from the basic  . . . narcotic investigator from DEA to advanced DEA investigations" and that he had knowledge about drug ledgers "[t]hrough experiences and through some teaching."  Although Detective Kajihara had testified about drug ledgers only one time previously, he described the different types of drug ledgers used by dealers.  He also explained the table he prepared and how he prepared it.  We note that despite a large number of documents found at 5225 Rustic Way, he said he considered just thirteen ledgers that were the easiest to interpret.  The trial court concluded that he had demonstrated knowledge about the papers found in the appellant's home that the average juror would not know, and, under these circumstances, we cannot say that the trial court erred by permitting Detective Kajihara to testify as an expert in drug ledgers.

The appellant also contends that Detective Kajihara's testimony that the appellant sold large amounts of drugs in the past was not relevant to any of the indicted offenses.  We disagree.  Count 1 alleged that the appellant conspired to sell 300 pounds or more of marijuana between January 2005 and September 2009.  The ledgers were highly relevant to that offense.  See Tenn. R. Evid. 402.  Moreover, we conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice.  Tenn. R. Evid. 403.

### E.  Limitation of Cross-Examination

The appellant contends that the trial court violated his right to present a defense by limiting his cross-examination of Jean Johnson regarding check deposits into his bank accounts. The State argues that the appellant is not entitled to relief. We agree with the State.

During Johnson's direct testimony, the State questioned her about bank accounts linked to the appellant.  She identified numerous exhibits containing multiple pages of bank documents and testified about cash deposits into the accounts.  During cross-examination, Johnson identified numerous bank statements for VEL Properties and VEL Trucking.  The trial court held a bench conference and asked the defense, "Why are we wasting so much time with this?"  The following colloquy then occurred:

[DEFENSE COUNSEL]: Your Honor, [the State] got to go through all of the cash deposits. And there are checks in the statements --

THE COURT: Are you going to go line by line through them? No, you're not. You're just introducing them. That's the point. If you're introducing them, then get them in.

[DENFESE COUNSEL]: We'll go line by line if you like.

THE COURT: No, I don't want you to go line by line. At some point both of you need -- the jury is just over this, you know.

[DEFENSE COUNSEL]: I understand.

. . . .

THE COURT: You are absolutely right now wasting the jury's time because all you're doing is having her go through them and, yeah, this is a bank record, this is a bank record. You don't have to do that. The State has already said they would stipulate that these are the bank records.

[DEFENSE COUNSEL]: There are a number of checks in this next set of things that I would like to be able to go through. If you don't want me to do that with her, then we'll do it with Agent Bilyeu.

. . . .

THE COURT: The State has agreed that these can be put in the record. And if that's all you want to point out, you know, you can get up and do it on your argument. Here it is. Or ask somebody else questions about it, they're in the record.

[DEFENSE COUNSEL]: For the record our position would be that the State brought these records in and omitted the check deposits.

THE COURT: Now, you've put it on the record, so they're in the record.

[DEFENSE COUNSEL]: May I finish?

THE COURT: No, you may not. I am telling you that if all you want to do is put in the record this witness is going to have to do it. What I am saying to you is I am ruling that you are wasting the jury's time pursuant to the Rules of Evidence. And I am cutting you off.

When cross-examination resumed, Johnson identified additional bank records, and the defense introduced the records into evidence. However, the defense did not question Johnson about the records.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (quoting State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

We can appreciate the trial court's prohibiting defense counsel from questioning Johnson about the records "line by line." However, the trial court also prohibited defense counsel from questioning Johnson about specific check deposits into the bank accounts. Part of the appellant's defense to the money laundering charges was that VEL Properties and VEL Trucking were legitimate businesses with legitimate income, and evidence that the appellant deposited checks from other legitimate businesses into those accounts was relevant to that defense. Therefore, we conclude that the trial court erred by prohibiting the appellant from questioning Johnson about the check deposits.

Nevertheless, we conclude that the appellant is not entitled to relief. During defense

-60-

counsel's colloquy with the trial court, counsel stated, "If you don't want me to do that with her, then we'll do it with Agent Bilyeu." When Agent Bilyeu testified as a witness for the State, the appellant cross-examined her about check deposits into his business accounts. He also questioned her about the check deposits when he called her as a witness. Therefore, the appellant has failed to show that the trial court's limiting his cross-examination of Johnson deprived him of his ability to establish that numerous checks were deposited into his accounts, and we conclude that the trial court's error was harmless beyond a reasonable doubt. See Chapman, 386 U.S. at 24; Rodriguez, 254 S.W.3d at 371.

### F. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his money laundering convictions and enhance the classification of his felony convictions for violating the Drug-Free School Zone Act. The State argues that the evidence is sufficient. We conclude that the evidence is insufficient to support the appellant's money laundering convictions in counts 14, 16, and 31.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). The standard of review 'is the same whether the conviction is based upon

direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in the indictment for counts 10, 13, 15, 19, 20, 32, and 34, which alleged money laundering related to the purchases of the hydroponic equipment, the purchase of the gooseneck trailer and tires, the purchase of the heat sealer, the payments for the storage unit, and the payment for the rental car, the State was required to prove that the appellant "knowingly [used] proceeds derived directly or indirectly from [the sale of marijuana] with the intent to promote, in whole or in part, the carrying on of [the sale of marijuana]." Tenn. Code Ann. § 39-14-903(b)(1). The appellant does not contend that any of the items or payments alleged in the seven counts were not used to promote the sale of marijuana. Instead, he claims that because the proof established that he owned a construction company "in and around the times for which he is indicted for money laundering," the State failed to prove that "he purchased the various goods and services with criminally derived proceeds."

Taken in the light most favorable to the State, the evidence shows that the appellant and numerous individuals entered into a conspiracy to sell 300 pounds or more of marijuana and that Jeremiah Robertson began delivering marijuana to the appellant's distributors in 2006 or 2007. The conspiracy and sale of marijuana continued until the appellant was arrested in March 2009. Agent Bilyeu testified that VEL Trucking, which was incorporated in August 2006 and dissolved in August 2008, received $320,000 in check deposits from February 2007 to June 2008. However, even assuming that all of those checks were legitimate income for the company, they would not have been enough to cover the total cost of the three dump trucks, which was almost $400,000, let alone the company's remaining expenses. In short, the evidence at trial established that the appellant's source of income was the sale of marijuana. Therefore, the evidence is sufficient to show that the appellant used the proceeds from the conspiracy to purchase the items and make the payments as alleged in the indictment.

As charged in the indictment for counts 14, 16, and 31, which alleged money laundering related to the purchases of the Chapparal boat, the 1965 Impala, and the theater seating, the State was required to prove that the appellant "knowingly [used] . . . proceeds derived directly or indirectly from [the sale of marijuana] to conduct . . . a financial transaction . . . with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds." Tenn. Code Ann. § 39-14-903(a)(1). The appellant claims that the evidence is insufficient because the State failed to prove that he purchased the items with the intent to conceal the proceeds.[10] We agree with the appellant.

In support of his claim, the appellant relies on State v. Jackson, 124 S.W.3d 139, 140-

---

[10]The State does not address the appellant's argument.

41 (Tenn. Crim. App. 2003), in which the defendant was convicted of money laundering for stealing personal checks and then trying to use one of the checks to purchase property at Circuit City. Upon being confronted by a police officer, the defendant admitted that he was trying to buy the merchandise and that he planned to return it for a refund. Jackson, 124 S.W.3d at 141. In considering the money laundering statute at issue, this court noted that

> federal courts have recognized that an accused who simply uses the proceeds of illegal activity to purchase items, is not guilty of money laundering:
>
>> "In one sense, the acquisition of any asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form. But the requirement that the transaction be designed to conceal implies that more than this trivial motivation to conceal must be proved."

Id. at 144 (quoting United States v. Willey, 57 F.3d 1374, 1384 (5th Cir. 1995). This court further stated as follows:

>> "The government's argument would convert every purchase of goods with illegally obtained credit into money laundering, which we have rejected: Money spending is not criminal under [18 U.S.C.] § 1956(a)(1). The statute is intended to punish 'conduct that is really distinct from the underlying specified unlawful activity[,] . . . [not to] provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts.'"

Id. (quoting United States v. Olaniyi-Oke, 199 F.3d 767, 771 (5th Cir. 1999) (quoting United States v. Brown, 186 F.3d 661, 670 (5th Cir. 1999))).

Here, nothing indicates that the appellant purchased the boat, the car, or the theater chairs with the intent to "conceal or disguise" the criminally derived proceeds. Thus, the evidence is insufficient to support he appellant's money laundering convictions in counts 14, 16, and 31, and the appellant's convictions for those offenses are reversed, and the charges are dismissed. We note that our reversal does not affect the appellant's total effective sentence because the trial court ordered that his sentences in counts 14 and 16 were to be

served concurrently with his sentence in count 15 and ordered that his sentence in count 31 was to be served concurrently with his sentences in counts 19 and 34.

Finally, the appellant contends that the evidence is insufficient "to sustain the school zone aspect of the Appellant's conviction in counts 1 and 35" because the legislature did not intend for the school zone enhancement to apply when a defendant is traveling on an interstate. The possession of drugs with intent to sell or deliver within one thousand feet "of the real property that comprises a public or private elementary school, middle school, [or] secondary school . . . shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1). In State v. Vasquez, our supreme court specifically rejected the defendant's claim "that simply traveling through a school zone is not enough to apply the provisions of the Drug-Free School Zone Act." 221 S.W.3d 514, 523 (Tenn. 2007). Therefore, while we can appreciate the appellant's argument, we believe the court has made clear that the enhancement applies for any travel within a school zone, even travel on an interstate.

## G. Excessive Sentence

The appellant contends that the trial court erred by ordering consecutive sentencing and that his effective ninety-four-year sentence violates the purposes of sentencing as provided in the Sentencing Reform Act. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Detective Kajihara testified that, in addition to the charges in this case, the appellant was also charged in case number 2010-D-3593 with one count of conspiracy to commit money laundering.[11] Andre White was charged in case number 2010-D-3593 with several counts of money laundering. Detective Kajihara stated that the charges resulted from an intercepted telephone call between the appellant and White on November 6, 2008. During the call, White said he needed a new place to stay. A subsequent investigation revealed that the appellant "negotiated the deal" for White to rent a home at 2412 Pleasant Springs Lane. Although White had no legitimate source of income, he paid the rent for the home in cash.

The State introduced the appellant's 2013 presentence report into evidence. According to the report, the then thirty-two-year-old appellant was single with two children. In the report, he stated that he graduated from high school and attended Middle Tennessee State University from 1999 to 2008, taking classes in business, finance, and real estate. The appellant also stated that his physical and mental health were excellent, that he had never used

---

[11]At the appellant's motion for new trial hearing, the State moved to dismiss the charge.

illegal drugs, and that he had always been self-employed. The report shows that the appellant has prior convictions for driving while impaired, selling drugs, vandalism, misdemeanor assault, and misdemeanor theft of services.

The trial court applied the following enhancement factors to the appellant's sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; and (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(1), (2), (8). The trial court gave great weight to factors (1) and (2). In mitigation, the trial court appeared to apply factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury." Tenn. Code Ann. § 40-35-113(1). The trial court sentenced the appellant as a Range I, standard offender to twenty-five years for count 1, conspiracy to possess over 300 pounds of marijuana in a drug-free school zone, a Class A felony; eleven years for each of the ten money laundering convictions in counts 10, 13 through 16, 19, 20, 31, 32, and 34, Class B felonies; six years for count 33, possession of ten pounds or more of marijuana with intent to deliver within a drug-free school zone, a Class C felony; twenty-five years in count 35, possession of 300 pounds or more of marijuana with intent to deliver within a drug-free school zone, a Class A felony; and four years in count 36, possession of ten pounds or more of marijuana with intent to deliver, a Class D felony. The trial court ordered that the appellant serve the eleven-year sentences in counts 10 and 13 concurrently; the eleven-year sentences in counts 20 and 32 concurrently; the eleven-year sentences in counts 14, 15, and 16 concurrently; the eleven-year sentences in counts 19, 31, and 34 concurrently; and the six-, four-, and twenty-five-year sentences in counts 33, 36, and 35 concurrently but that the appellant serve each of those effective sentences consecutively to each other and the twenty-five-year sentence in count 1 for a total effective sentence of ninety-four years in confinement.[12]

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics

---

[12]We note that for those offenses committed in violation of the Drug-Free School Zone Act, a defendant must serve the minimum sentence in the range of punishment at 100%. See Tenn. Code Ann. § 39-17-432(c).

of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S .W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act] .'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The trial court found that consecutive sentencing was appropriate because the appellant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood. See Tenn. Code Ann. § 40-35-115(1). The appellant does not contest the trial court's finding but claims that the court's use of consecutive sentencing, in addition to the court's enhancing his sentences and his having to serve forty years with no opportunity

for parole as required by the Drug-Free School Zone Act, results in an unjust life sentence.

We conclude that the appellant's consecutive sentences and resulting ninety-four-year sentence do not violate general sentencing principles. "[T]he Sentencing Reform Act intends sentencing to be individually tailored to each offender based upon a variety of considerations. There is no equation to follow, and sentencing must be determined on a case-by-case basis." State v. Ricky Keele, No. 02C01-9805-CC-00139, 1999 WL 150871, at *4 (Tenn. Crim. App. at Jackson, Mar. 22, 1999). In determining that consecutive sentencing was appropriate in this case, the trial court noted the appellant's prior convictions and that he stated in a previous presentence report, "I see now that the money I made [selling drugs] was not worth the trouble I had gotten myself into. My focus is on finishing college and earning an honest living." The trial court stated that "clearly he is somebody who didn't learn anything from his prior contact with the law" and that "[y]ou knowingly devoted your life to the sale of large amounts of marijuana in the county." We note that the appellant's ninety-four-year sentence is the direct result of not one conviction but numerous convictions in this case, including a drug conspiracy that occurred over the course of several years; his prior criminal history; and his unsuccessful attempt at rehabilitation. We also note that although the appellant became aware of law enforcement's surveillance in 2008, he continued, undeterred, to lead an extensive drug operation involving large amounts of marijuana. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing the appellant.

The trial transcript clearly shows that the jury convicted the appellant in count 36 of facilitation of possession of ten pounds or more of marijuana with intent to deliver, a Class E felony, as a lesser-included offense of the charged offense, possession of ten pounds or more of marijuana with intent to deliver, a Class D felony. However, the trial court sentenced him for the charged offense. Therefore, the appellant's sentence for count 36 is modified from four years, the maximum punishment in the range for a Class D felony, to two years, the maximum punishment in the range for a Class E felony. See Tenn. Code Ann. § 40-35-112(a)(4), (5). Moreover, the case is remanded to the trial court for correction of the judgment.

## H. Cumulative Error

The appellant contends that he is entitled to a new trial based upon cumulative error. However, we find no merit to this claim.

## IV. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's convictions of money laundering in counts 14, 16, and 31 must be reversed and

the charges dismissed. We also conclude that the appellant's sentence in count 36 must be modified from four to two years and that the case must be remanded to the trial court for correction of the judgment. The appellant's remaining convictions and effective ninety-four-year sentence are affirmed.

_____
NORMA McGEE OGLE, JUDGE